552 F.2d 1351
 In re TEDLOCK CATTLE COMPANY, INC., a California Corporation
as such and d/b/a Andahl Cattle Company, Alleged Bankrupt.
OFFICIAL CATTLE CONTRACT HOLDERS COMMITTEE, Creditor-Appellant,
v.
David COMMONS, Trustee in Bankruptcy, Trustee-Appellee.
 No. 75-3511.
 United States Court of Appeals,
Ninth Circuit.
 May 2, 1977.
 
 Bruce H. Spector, Stutman, Treister & Glatt, Los Angeles, Cal., argued, for creditor-appellant.
 Edith R. Warkentine, Gendel, Raskoff, Shapiro & Quittner, Los Angeles, Cal., argued, for trustee-appellee.
 Appeal from the United States District Court for the Central District of California.
 Before HUFSTEDLER, GOODWIN and ANDERSON, Circuit Judges.
 PER CURIAM:
 
 
 1
 The contest in this bankruptcy appeal is between two theories for measuring recovery for defrauded investors: out-of-pocket loss, or benefit of the bargain.
 
 
 2
 This Ponzi investment scheme created different classes of losers: investor creditors and commercial, or supplier, creditors. The claims of the commercial or supplier creditors are not before us on this interlocutory appeal, but the existence of these claims and equitable considerations arising out of the varieties of claims complicate the case.
 
 
 3
 The claims of the investor creditors fall into three general groupings: those who were in, and out of, the investment scheme early and suffered no net loss; those who let their paper "profits" ride and received some payments but also realized net losses on their investment; and those who entered the scheme late and lost all of their original investment when the scheme collapsed.
 
 
 4
 This particular fraud utilized an appeal to the cupidity of those interested in becoming cattle-feedlot millionaires. But it could have been based upon fictitious mangrove marinas or desert condominium mirages. The early investors, as usual in such plans, received financial reports showing large "profits" which they were invited to let ride. Most did. Those who took their "profits" and got out are not before us, but their good fortune explains in part what happened to the money of later subscribers.
 
 
 5
 The trustee of the bankrupt promoter's estate decided to apportion the assets to all the investor-creditors on the basis of restitution of a share of their original investments. This cash-in-cash-out plan was called the "equity" theory. The creditors committee, mostly investors who got in early enough to have a claim to the paper "profits" included in their accounts, would prefer the "benefit of the bargain" as the measure of their recovery.
 
 
 6
 Under the equity theory, no investor creditor will receive the benefit of his bargain, but all will share some recovery. Under the benefit-of-the-bargain theory, some of the early subscribers who received cash dividends and also let some of their paper "profits" ride theoretically could recover more than they invested.
 
 
 7
 Under California law, which is stipulated to govern these contracts, creditors are generally entitled to benefit-of-the-bargain damages. This comports with the principle of contract law that a defrauded party to a contract may either rescind the contract and sue for fraud, or affirm the contract and sue for damages. Indeed, the trustee does not dispute the state-law theory of damages.
 
 
 8
 The difficult question is whether state law should apply. The Supreme Court, in Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946), held:
 
 
 9
 " * * * What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition in bankruptcy is filed is a question which, in the absence of overruling federal law, is to be determined by reference to state law * * * ." 329 U.S. at 161, 67 S.Ct. at 239.
 
 
 10
 Appellant has also cited us to several other cases applying this doctrine to contract situations. See In re Oscar Nebel Co., 117 F.2d 326 (3d Cir. 1941); In re Riverview Products, D.C., 34 F.Supp. 482, aff'd, 34 F.Supp. 733 (W.D.N.Y.1940); 3A W. Collier, Bankruptcy P 63.02, at 1764 ("The federal court, in determining the validity of the obligation on a claim, will normally have recourse to the law of the state applicable to the debt in question."); P 63.23, at 1885 ("The validity of a (contract) claim is an issue to be determined by * * * (state) law.")
 
 
 11
 The trustee, however, argues that this is one of those cases in which overriding federal law must be applied. Indeed, in Vanston, the Court held that equitable principles in a bankruptcy situation overrode state law. 329 U.S. at 162, 67 S.Ct. 237. In Vanston, the issue was the validity of a claim of interest upon interest, and the Court held that its allowance would not be in accord with the equitable principles governing bankruptcy distributions.
 
 
 12
 Here, the trustee argues that the payment of benefit-of-the-bargain damages would not be in accord with the equitable principles governing bankruptcy distributions. The trustee argues that purchasers should not be able to recover on a claim based on a profit that was never earned. For example, if an early investor got back his original investment but let his "profit" ride, the trustee would not allow him any recovery. The trustee argues that because such a claimant's original investment was repaid at the expense of later investors, a form of subrogation comes into being. The trustee also argues that the allowance of additional benefit-of-the-bargain damages based upon "false profits" would unfairly defeat the claims of investors who have as of yet received nothing.
 
 
 13
 The parties have cited very little case law. The closest authority is In re Young, 294 F. 1 (4th Cir. 1923). Young, the bankrupt, was a confidence artist who induced several thousand people to invest their money with him for management. For a percentage, Young agreed to invest the money, evidently as a common fund, and to report and pay out profits. Young's investments were not profitable, but, nevertheless, to keep the scheme afloat, Young reported fictitious profits and paid them out upon request. The money to make the payments was obtained from the principal of the fund or from money paid in by new investors.
 
 
 14
 Young's claimant had paid over $4,000 into the fund. He had received profits of some $2,300, and had withdrawn $2,000 of his original investment. Later he received an additional $500 profit on his remaining investment. When Young went into bankruptcy, the claimant put in a claim for the $2,000 principal remaining in the account.
 
 
 15
 The Fourth Circuit held that the claimant could not share in the remaining funds until he had accounted for his profits. The court reasoned that recovery of both false profits and his original investment would not be equitable because the "profits" had been paid at the expense of the other equally innocent investors in the fund.
 
 
 16
 Although In re Young differs from our case in that the measure of damages was not in dispute, it is similar in that "profits" had been paid out at the expense of other investors. In fact, it appears that the formula used for claims in Young (i. e., amount paid in, less amount received) is the same formula used by the trustee in our case. We conclude that the trustee properly can use the equitable theory advanced by In re Young, but that the case must be remanded for fresh consideration of all the claims.
 
 
 17
 We noted earlier that the claims of supplier creditors were not before us. Theoretically, the suppliers of goods and services were benefit-of-the-bargain creditors. In the collapse of this particular scheme, the commercial suppliers became victims of a different character of wrong than the wrong done to the investor creditors. The suppliers were not planning to invest in the risk-taking phase of the business; they became captive risk takers. The investor- creditors planned to take some risks which were virtually built into the fraudulent scheme from the start. Their participation was part of the promotion.
 
 
 18
 It may well be equitable to classify the claims of investor creditors, because of the promotional relationship early investors have in building up the momentum and volume of investments of others, differently from the claims of suppliers. The different classes may then deserve different treatment.
 
 
 19
 Accordingly, the trustee should recalculate the claims of the various classes of creditors as their equities may appear when all claims are considered.
 
 
 20
 We express no opinion upon the merits of the various claims, or on the details of subrogation plans, if any, the trustee may devise for the various classes of investors. We hold only that the trustee can follow In re Young, supra, if the equities of the parties so indicate. It is appropriate for the bankruptcy judge to recompute the measure of individual recovery as the facts develop in future proceedings.
 
 
 21
 Remanded for further proceedings.