In re Michael Wayne **EDGE** and Thomas Anderson **Roach**, Debtors.

Frances S. **ROACH**, Plaintiff,

v.

Michael Wayne **EDGE** and Thomas Anderson **Roach**, Defendants.

Bankruptcy Nos. 383–00637, 383–00618.
Adv. No. 384–0359.

United States Bankruptcy Court,
M.D. Tennessee.

May 9, 1986.

Brenda Rhoton,

Thomas F. Mink, II, Nashville, Tenn., for plaintiff.

Paul E. Jennings, Beth Roberts Derrick, Waddey & Jennings, Nashville, Tenn., for defendant Edge.

C. Kinian Cosner, Jr., Cosner & Waldschmidt, Nashville, Tenn., for defendant Roach.

## MEMORANDUM

KEITH M. LUNDIN, Bankruptcy Judge.

The question presented is whether the victim of the debtors' (alleged) prepetition negligence has a "claim" in bankruptcy where discovery of the negligence occurred postpetition. I find that the plaintiff has a claim in these bankruptcy cases.

The following constitute findings of fact and conclusions of law. Bankruptcy Rule 7052. This is a core proceeding. 28 U.S.C. § 157(b)(2)(B), (I) (1982 ed., Supp. II 1984).

### I.

The debtors were dentists engaged in a joint practice. The plaintiff received dental treatment from both debtors prior to bankruptcy. The debtors separately filed Chapter 7 petitions in March, 1983 and each listed plaintiff as a creditor based on claims not at issue here. The plaintiff received timely notice of both filings. Dr. Roach and Dr. Edge received their discharges on January 31, 1984 and July 30, 1984, respectively.

In late July 1983 the plaintiff discovered she may have received negligent dental treatment from one or both debtors. On July 26, 1984 she sued both debtors in the Circuit Court of Davidson County, Tennessee alleging negligence and demanding compensatory and punitive damages. Motions for sanctions for violation of the stay were filed in this court by the debtors. The plaintiff then filed this adversary proceeding asking a declaration that her "claim" arose postpetition upon discovery of her dental injuries and thus is not subject to the stay of § 362. The debtors contend that the plaintiff's claim arose prepetition when the alleged negligent treatment occurred.

### II.

With exceptions enumerated in 11 U.S.C. § 523 (1982 ed.), the discharge in bankruptcy relieves the debtor of all debts that arose before the date of the petition. 11 U.S.C. § 727(b). *Ohio v. Kovacs,* 717 F.2d 984 (6th Cir.1983), *aff'd,* 469 U.S. 274, —, 105 S.Ct. 705, 708, 83 L.Ed.2d 649, 655 (1985). It is not argued that the negligence claims against these debtors are excepted from discharge by § 523.[1] The plaintiff

---

1. The original deadline for filing objections to the dischargeability of debts under 11 U.S.C. §§ 523(a)(2), (4) or (6) was twice extended upon request of the plaintiff. Ultimately, the parties agreed to extend the deadline to October 25, 1983. On October 25, 1983, plaintiff filed

rests on the proposition that undiscovered prepetition negligence does not constitute a claim for bankruptcy purposes.

The Bankruptcy Code defines "debt" as "liability on a claim." 11 U.S.C. § 101(11) (1982 ed.). "Claim" is defined in 11 U.S.C. § 101(4) (1982 ed.):

> (4) "claim" means—
>
> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
>
> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

The parties agree that if the plaintiff had a "right to payment" at the time of filing, then the plaintiff has a "claim" and a "debt" in these bankruptcy cases.

The Code provisions reproduced above twice substitute one set of undefined words for another. The definition of debt as liability on a "claim" is not helpful; nor is "right to payment" especially enlightening of the meaning of "claim."

We first attempt to determine the content of these words from the surrounding statutory language. Section 101(4)(A) is broadly worded. If "right to payment" is not all encompassing, the phrase which follows—"whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, secured, or unsecured"—seems intended to include every combination and permutation of events extant or in futuro which might effect a right to payment. This expansive context suggests that "right" should not restrict the compass of "claim". A dictionary approach gives us "a power, privilege, faculty, or demand, inherent in one person and incident upon another." Black's Law Dictionary, 1189 (5th ed. 1979).

Legislative history confirms that Congress intended the broadest definition for "claim" in bankruptcy. The House Report explains: "By this broadest possible definition ... the bill contemplates that all legal obligations of the debtor, *no matter how remote or contingent,* will be able to be dealt with in the bankruptcy case. It permits the broadest possible relief in the bankruptcy court." H.R.REP. NO. 595, 95th Cong., 2d Sess. 309 (1979) *reprinted in* 1978 U.S.CODE CONG. & AD.NEWS 5963, 6266 (emphasis added). One commentator states, "by using the broadest

---

against Dr. Edge a "Complaint to Determine Dischargeability of Judgment and for Damages" (Adv. No. 383–0610) not related to malpractice. By judgment entered February 29, 1984 that adversary proceeding was dismissed. No complaint objecting to discharge or dischargeability was filed against Dr. Roach.

The dischargeability of a claim for prepetition misconduct is a question separate and distinct from the existence of the claim itself. *See* 11 U.S.C. §§ 523, 1141, 1328 and 727 (discharge) (1982 ed.).

The theory of claims herein adopted, admits of the possibility that a victim of the debtor's prepetition misconduct has a claim in bankruptcy notwithstanding that the victim knows not of any injury and may be known to the debtor only as a member of a class. Acknowledging that victims of prepetition torts have claims implicates the need to develop methods to identify claimholders and to give notice, and the need to design systems to compensate "future claimants." *See In re UNR Industries, Inc.,* 725

F.2d 1111, 1119 (7th Cir.1984). If notice and participation cannot be provided, then difficult questions are presented whether a claim held by someone who cannot timely and reasonably be given notice is dischargeable. These problems are only approached by 11 U.S.C. § 523(a)(3). To the extent due process prohibits dealing with such claimholders, there may be limits to the discharge in bankruptcy. However, those limits are not defined by the concept of "claim" but by the due process rights of those who have been hurt and are unaware of their injuries. Due process may require no more than the best possible notice under the circumstances. *Mullane v. Central Hanover Bank and Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

This declaratory action seeks determination of the existence of a "claim" and exposition of the effect of § 362 on the plaintiff's postpetition suit against the debtors. The dischargeability of plaintiff's claim is not before the court. Neither is the question presented what rights, if any, this claimholder has in the assets of these estates.

possible language to describe the rights to payment which constitute the claims under subsection 101(4)(A), Congress expressed unequivocally the intention that all monetary rights be asserted and resolved in the bankruptcy proceeding." Matthews, *The Scope of Claims Under the Bankruptcy Code (First Installment)*, 57 AM.BANKR. L.J. 221, 223 (Summer 1983). The Supreme Court recently observed "it is apparent that Congress desired a broad definition of a 'claim' and knew how to limit the application ... when it desired to do so." *Kovacs*, 469 U.S. at ——, 105 S.Ct. at 709, 83 L.Ed.2d at 656 (footnotes omitted). The United States Court of Appeals for the Second Circuit summarized the legislative history and judicial statements of the extent of claims in bankruptcy:

> The legislative history of the Code reveals that in enacting § 101(4), Congress sought the "broadest possible definition" of a claim, House Report at 309, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6266, intending that virtually all obligations to pay money be amenable to treatment in bankruptcy proceedings. The present language of § 101(4)(A) first appeared in H.R. 8200, 95th Cong., 1st Sess. § 101(4)(A), 123 Cong.Rec. 35,644, 35,644 [sic] (1977). In the report accompanying that bill, the House of Representatives Committee on the Judiciary explained the intent of its new definition of claim as follows:
>
>> H.R. 8200 abolishes the concept of provability in bankruptcy cases. All claims against the debtor, whether or not contingent or unliquidated, will be dealt with in the bankruptcy case.... The proposed law will permit a complete settlement of the affairs of a bankrupt debtor, and a complete discharge and fresh start.
>>
>> ....
>>
>> ... [Section 101(4) adopts an even broader definition of claim than is found in the present debtor rehabilitation chapters.... By this *broadest possible definition,* and by the use of the term throughout the title 11, ... the bill contemplates that *all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case.* It permits the broadest possible relief in the bankruptcy court.

House Report at 180, 309 (emphasis added; footnotes omitted), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6141, 6266. The Senate Report that accompanied S. 2266, *reprinted in Bankruptcy Reform Act of 1978: Hearing on S. 2266 and H.R. 8200 Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary,* 95th Cong., 1st Sess. 3 (1977), a bill with language identical to that of § 101(4)(A), contained an explanation of the new definition of claim identical to that contained in the House Report. *See* S.Rep. No. 989, 95th Cong., 2d Sess. ("Senate Report") 21–22, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5807–08.

Consistent with the congressional intent evinced by the legislative history, courts construing § 101(4) in a variety of contexts not involving restitutionary debts have acknowledged the breadth of the definition of claim, characterizing it as, *inter alia,* "broad," *Ohio v. Kovacs,* 469 U.S. 274, ——, 105 S.Ct. 705, 709, 83 L.Ed.2d 649 (1985); "very broad," *In re M. Frenville Co.,* 744 F.2d 332, 336 (3d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985); "extremely broad[ ]," *In re Kennise Diversified Corp.,* 34 B.R. 237, 244 n. 6 (Bankr. S.D.N.Y.1983); "could not be broader," *In re Thomas,* 12 B.R. 432, 433 (Bankr.S. D.Iowa 1981); "broadest possible," *Kallen v. Litas,* 47 B.R. 977, 982 (N.D.Ill. 1985); *In re Vasu Fabrics, Inc.,* 39 B.R. 513, 517 (Bankr.S.D.N.Y.1984); *In re Johns-Manville Corp.,* 36 B.R. 743, 754 n. 6 (Bankr.S.D.N.Y.1984); "all-encompassing," *In re Baldwin-United Corp.,* 48 B.R. 901, 903 (Bankr.S.D.Ohio 1985); *In re Barnett,* 42 B.R. 254, 257 (Bankr.S. D.N.Y.1984); and "sufficiently broad to cover any possible obligation," *In re*

*Smith Jones, Inc.*, 26 B.R. 289, 293 (Bankr.D.Minn.1982).

*Robinson v. McGuigan*, 776 F.2d 30, 34–35 (2d Cir.1985), *cert. granted sub nom.*, *Kelly v. Robinson*, —— U.S. ——, 106 S.Ct. 1181, 89 L.Ed.2d 298 (1986).[2]

The broad concept of claim intended by Congress in 1978 signalled an important departure from prior law. Under § 63 of the 1898 Act (11 U.S.C. § 103 (1979 repealed)) only those debts which were "provable" were allowed against the bankrupt's estate. Provability was interpreted to exclude most tort claims from consideration in bankruptcy cases. *See* 3A J. MOORE, COLLIER ON BANKRUPTCY ¶ 63.25[1] (14th ed. 1975). Holders of "unprovable" tort rights were excluded from distribution of the estate and were permitted to pursue the debtor's postpetition assets. The basic irrationality of admitting to proof claims based on contract but excluding most claims based on tort lead to many convoluted exceptions to the nonprovability of tort claims and eventually to abandonment of the general rule. As one commentator explains:

The effect of the definition is a significant departure from prior law. Under Section 1 of the former Act, "claim" was not defined. The term was only used with the concept of provability in Section 63 of the former Bankruptcy Act to limit the kinds of debts that were payable in a bankruptcy case.... [A]s distinguished from prior law, tort claims constitute claims and thus may be payable out of the estate and would be dischargeable. Under former Section 63 only limited types of tort claims were provable in a bankruptcy case.

2 L. KING, COLLIER ON BANKRUPTCY ¶ 101.04 (15th ed. 1985).

The 1978 Legislative treatment of the *allowance* of claims effects participation for the broadest range of claimholders. Allowance of claims is controlled by 11 U.S.C. § 502:

(a) A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects.

(b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, *except to the extent that—*

(1) *such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured.*

11 U.S.C. § 502 (1982 ed., Supp. II 1984) (emphasis added).

The emphasized exception to the exception in § 502(b)(1) is revealing. Claims that are unenforceable under applicable law are "not allowable" in a bankruptcy case, but this exception to allowance is not operative where the disability of the claimholder results from the "contingent or unmatured" nature of the claim. This is a foundation

---

**2.** This court discussed the broad meaning of "claim" and reached the same conclusions as the Second Circuit in *Brown v. Shriver*, 39 B.R. 820 (Bankr.M.D.Tenn.1984). Consistent with our holding in this case, in *Brown* we found that a victim's claim for criminal injury arises at the time of the criminal event and not later when a civil judgment or criminal restitution order issues:

The "claim" in this case arose when Brown damaged Seat's home. The "debt," or liability on that claim, existed at that time and, like most debts, was entitled to thrive in the bankruptcy context without the intervention of any court. The debt between the debtor and Seat was fully cognizable in bankruptcy and if not within an exception to discharge, fully dischargeable in bankruptcy before the criminal court became involved. Had Seat gone into a state civil court and reduced his debt to a judgment, in the absence of an exception to discharge or dischargeability, the civil judgment, along with the debt, would have been discharged.

*Brown*, 39 B.R. at 822.

principle of the 1978 Code: creditors may be entitled to allowable claims in bankruptcy even though remedies are not yet (and may never be) available under nonbankruptcy law.

With this background, the question is presented whether bankruptcy courts apply state or federal law to identify a claim in bankruptcy. Interpreting the former Bankruptcy Act, the Supreme Court answered by distinguishing the *allowance* of claims from the *existence* of a claim. In *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946), Justice Black explained:

> What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition in bankruptcy is filed is a question which, in the absence of overruling federal law, is to be determined by reference to state law ... [A[ssuming, arguendo, that the obligation ... is valid under [state law], ... we would still have to decide whether allowance of the claim would be compatible with the policy of the Bankruptcy Act.

*Vanston,* 329 U.S. at 162, 67 S.Ct. at 239–240, 91 L.Ed. at 165–66 (citations and footnotes omitted). The court of appeals for this circuit speaking through Circuit Judge Harry Phillips stated the holding in *Vanston* as follows:

> The Supreme Court has now made it clear that federal, and not state, law will be applied in determining the allowability of claims in bankruptcy proceedings.... At the same time, however, the Court has pointed out that federal law should be applied with "appropriate regard for rights acquired under rules of state law." ...

Perhaps the rule was best explained by Justice Frankfurter in his concurring opinion in *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162. There the majority had reiterated the proposition that federal law will be used to determine how and what claims shall be allowed. 329 U.S. at 162–63, 67 S.Ct. 237. Justice Frankfurter agreed, but pointed out that the preliminary question of whether or not a claim exists, to which federal law is then applied, must be determined with reference to state law. 329 U.S. at 169–70, 67 S.Ct. 237.

Therefore we turn to Tennessee law to determine whether the claim in the instant case is absolutely void, or is a claim which merely might be unenforceable in the state courts.

*Leeds Homes, Inc. v. National Acceptance Co. of America,* 332 F.2d 648, 649–50 (6th Cir.1964).

This same logic has been applied to determine the existence of a claim after enactment of the 1978 Code. In *Avellino & Bienes v. M. Frenville Co.,* 744 F.2d 332 (3d Cir.1984) *cert. denied,* — U.S. —, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985), the Third Circuit, citing *Vanston,* held as follows:

> Although "claim" is defined by § 101(4), the Code does not define when a right to payment arises. Thus, while federal law controls which claims are cognizable under the Code, the threshold question of when a right to payment arises, absent overriding federal law, "is to be determined by reference to state law."

*Frenville,* 744 F.2d at 337.[3]

The expansive wording of §§ 101(4) and 502 of the 1978 Code makes more difficult

---

3. In a footnote to this portion of its opinion, the Third Circuit suggests this limitation on reliance on state law:

> If there were some overriding federal policy, we might have the power to develop federal law. *See In re Beck Indus., Inc.,* 725 F.2d 880, 891 (2d Cir.1984); *In re Johns-Manville Corp.,* 36 B.R. 743, 751 n. 4 (Bankr.S.D.N.Y.), *appeal denied,* 39 B.R. 234 (S.D.N.Y.1984). A bankruptcy proceeding stemming from a mass tort—such as exposure to asbestos—may

be a case in which the application of federal law is indicated.

*Frenville,* 744 F.2d at 337 n. 8. In this same vein, Judge Lifland notes in *Johns-Manville,* 36 B.R. at 743 that reference to state law, even if possible and accurate, may produce a conflict with overriding policies of federal law:

> Furthermore, under the Bankruptcy Code, if state law notions so narrow the definition of a "claim" as to frustrate the stated objective of providing the debtor the broadest possible re-

application of the general principle of reference to state law articulated in *Vanston, Leeds* and *Frenville*.[4] As demonstrated above, the 1978 law goes further than the former Act to affect rights which are contingent or unmatured under state law. It is conceptually difficult to refer to state law to determine when a "right to payment" arises where by federal law a "right to payment" spawns a claim notwithstanding that the right is contingent, unmatured, etc. 11 U.S.C. § 101(4) (1982 ed.). State courts use the same words (contingent, unmatured) to describe rights which are yet to become cognizable under state law. The plain meaning of §§ 101(4) and 502(b)(1) is that state law will not control the existence or allowance of a bankruptcy claim where under state law the right to payment depends only on one or more of the enumerated disabling characteristics.

This view does no violence to the holding in *Leeds* that bankruptcy claims should be defined with "appropriate regard for rights acquired under ... state law." *Leeds*, 332 F.2d at 649. It merely recognizes that the 1978 Code erodes the extent of appropriate reliance on state law in this area.

Reference to state law to determine the meaning of "right to payment" generates some confusion and little insight. The Tennessee courts have no obvious reason to use the precise phrase "right to payment." Similar phrases appear in a variety of contexts, for example, a "duty to pay" arises upon tender of delivery under the Uniform Commercial Code. *See* TENN.CODE ANN. § 47–2–507(1) (Michie 1979). This court has been unable to find a Tennessee

---

lief, state law must yield to an overriding federal construction. *Cf. Chicago Board of Trade v. Johnson*, 264 U.S. 1, 10, 44 S.Ct. 232, 234, 68 L.Ed. 533 (1924) (property rights are generally regulated by state law, but "when the language of Congress indicates a policy requiring a broader construction of the [bankruptcy] statute than the state decisions would give it, federal courts cannot be precluded by them"); *Pierro v. Taddeo (In re Taddeo)*, 685 F.2d 24 (2d Cir.1982) (bankruptcy court could cure defaults and authorize "deacceleration" of mortgage and reinstate original payment schedule irrespective of conflicting state law); *In re Gladstone Glen*, 628 F.2d 1015 (7th Cir. 1980) (Illinois characterization of beneficiary's interest in land trust as personal property is not controlling for purposes of filing petition for relief as "debtor" under Chapter XI of Bankruptcy Act); *Coldwell Banker & Company v. Godwin Bevers, Inc. (In re Godwin Bevers, Inc.)*, 575 F.2d 805 (10th Cir.1978) (fully performed listing contract which may have been executory under California law only gives rise to a provable, contingent unsecured claim for bankruptcy purposes); *Official Cattle Contract Holders Committee v. Commons (In re Tedlock Cattle Company)*, 552 F.2d 1351 (9th Cir.1977) (notwithstanding California law providing benfit-of-the-bargain damages, bankruptcy trustee could properly apply overriding federal law and apportion assets under equitable cash-in-cash-out theory).
*Johns-Manville*, 36 B.R. at 755 n. 6.

**4.** At least one court has suggested that *Frenville* misapplied the Supreme Court's holding in *Van-*

ston·and relied inappropriately on state law to determine that a claim did not exist for bankruptcy purposes. In *In re Yanks* the bankruptcy court departed from the holding in *Frenville* as follows:

> The court's reliance upon *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946), appears to be misplaced. While the Supreme Court did state, at page 161, 67 S.Ct. at page 239, ...
> What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition in bankruptcy is filed is a question which, in the absence of overruling federal law, is to be determined by reference to state law.
> the Court also said, at page 162, 67 S.Ct. at page 240, ...
> In determining what claims are allowable and how a debtor's assets shall be distributed, a bankruptcy court does not apply the law of the state where it sits.
> and finally stated, at page 163, 67 S.Ct. at page 240, ... that bankruptcy courts are bound to follow the Bankruptcy Act as interpreted by the Supreme Court. The holding of that case is that federal case law under the Bankruptcy Act and developed in federal equity receiverships prohibited the allowance of a claim which was valid and enforceable under state law. That holding does not support *Frenville's* reliance upon state law to determine if a claim existed against the debtors at the time that the bankruptcy cases were commenced.
*In re Yanks*, 49 B.R. 56, 58, 2 COLLIER BANKR. CAS.2d (MB) 1089 (Bankr.S.D.Fla.1985).

statute or decision employing the phrase "right to payment" in any helpful context.[5]

The parties have focused on Tennessee decisions dealing with limitations of actions. This approach has been criticized. *See, e.g., In re Johns-Manville Corp.*, 36 B.R. 743, 752–53 (Bankr.S.D.N.Y.1984). The Tennessee law of limitations of malpractice actions demonstrates why reference to state limitations law is unsatisfying to determine when a right to payment arises for bankruptcy purposes.

Prior to 1974 its was the rule in Tennessee that a cause of action for medical malpractice accrued for statute of limitation purposes at the time of the negligent act. *See, e.g., Bodne v. Austin*, 156 Tenn. 366, 2 S.W.2d 104 (1928). In *Teeters v. Currey*, 518 S.W.2d 512 (Tenn.1974), the Tennessee Supreme Court abandoned a half-century of precedent and adopted the "discovery rule" for malpractice actions:

> [T]he cause of action accrues and the statute of limitations commences to run when the patient discovers, or in the exercise of reasonable care and diligence for his own health and welfare, should have discovered the resulting injury.

*Teeters*, 518 S.W.2d at 517. The victim of medical malpractice has one year from the date of discovery to commence an action. *See* TENN.CODE ANN. §§ 28–3–104 and 29–26–116 (Michie 1979).

The Tennessee legislature reacted to *Teeters* by passing the Medical Malpractice Review Board and Claims Act of 1975, TENN.CODE ANN. §§ 29–26–101 *et seq.* (Michie 1979) (repealed in part). The 1975 Act superimposes a three year ceiling on the discovery rules' one year limitation period: "... in no event shall any such action be brought more than three (3) years after the date on which the negligent act or omission occurred." TENN.CODE ANN. § 29–26–116(a)(3) (Michie 1979).

In *Foster v. Harris*, 633 S.W.2d 304 (Tenn.1982) the Tennessee Supreme Court discussed when a "cause of action" accrues for counting the statute of limitations. In

*Foster*, the defendant dentist treated the plaintiff in October, 1975 and allegedly lacerated his finger and plaintiff's lip such that their bloods intermingled. In January, 1976 the plaintiff determined he was suffering from serum hepatitis, a disease acquired only through blood contact. The plaintiff did not know the source of blood contact until July, 1976 when the defendant revealed he was infected with serum hepatitis when he treated the plaintiff in October, 1975. The court held that the cause of action accrued for purposes of the statute of limitations when the source of the injury and the tortfeasor were discovered in July, 1976. Justice Fones indicated that a medical malpractice cause of action exists when a judicial remedy is available to the plaintiff:

> [A] cause of action in tort does not exist until a judicial remedy is available to the plaintiff; that before a judicial remedy exists, two elements must coalesce, (1) a breach of some legally recognized duty owed by the defendant to the plaintiff; (2) that causes the plaintiff some legally cognizable damage. *McCroskey v. Bryant Air Conditioning Co.*, 524 S.W.2d 487, 489–90. It is axiomatic that no judicial remedy was available to this plaintiff until he discovered, or reasonably should have discovered, (1) the occasion, the manner and means by which a breach of duty occurred that produced his injury; and (2) the identity of the defendant who breached the duty.

*Foster*, 633 S.W.2d at 305.

In the interim between *Teeters* and *Foster*, the Tennessee Court of Appeals decided *Jones v. Morristown-Hamblen Hospital Ass'n, Inc.*, 595 S.W.2d 816 (Tenn.Ct.App. 1979), *appeal denied*, (Tenn.1980). The chronology of events in *Jones* presented an awkward and difficult dilemma. A mole was removed from the decedent's neck in May of 1970 and on June 2, 1970 was negligently diagnosed to be without malignancy. This negligent act occurred pre-

---

**5.** Other state courts have addressed the question in the context here presented—to determine the effect of a bankruptcy discharge on an asserted claim. *See, e.g., American Bank of Richmond v. Missouri Farmers Ass'n, Inc.*, 695 S.W.2d 150 (Mo.App.1985).

*Teeters* and the statute of limitations advanced from the date of the negligent act. The decedent obtained majority in January of 1974. In December of 1974 the Tennessee Supreme Court decided *Teeters*. The misdiagnosed malignancy was discovered in January, 1976; the decedent died in May, 1976 and suit commenced in January, 1977.

At the time of *Teeters*, the decedent in *Jones* had not discovered the negligent diagnosis of her injuries. Applying *Teeters*, "decedent's right of action would not have been barred until one year after the discovery of malignancy, January 13, 1977." *Jones*, 595 S.W.2d at 819. The court observed "this result would obtain even if the statute of limitation had run on decedent's right of action before *Teeters* had been decided." *Id.* In a footnote the Tennessee Court of Appeals gives this example:

> For example, Doe, an adult, receives negligent medical treatment in January '73, but does not discover it until February '75. The right of action under prior law was barred on January '74. Under *Teeters*, Doe could timely sue until February '76.

*Jones*, 595 S.W.2d at 819 n. 1.

However, discovery and the suit in *Jones* occurred after enactment of the Medical Malpractice Review Board and Claims Act of 1975. As indicated above, the 1975 Act added a three year "cap" on all malpractice actions. TENN.CODE ANN. § 29-26-116(a)(3) (Michie 1979).

The Court of Appeals in *Jones* concluded that with the 1975 Act "it once again is possible for an individual's right to sue to expire before its existence is known." *Id.* at 821.

To explain the interaction of *Teeters* and the 1975 law, the court distinguishes "cause of action" from "right of action" as follows: [6]

> [T]he right of action which had accrued under pre-*Teeters* law was barred after January 10, 1975—almost six months before the effective date of the [Medical Malpractice Review Board and Claims] Act. We do not read *Teeters* to extend that right. The effect of *Teeters* was to create another potential right of action— one which might accrue even after the limitation had run under prior law.

> . . . .

> *Teeters* gave decedent only a potential right of action. The opinion states clearly that a right of action does not accrue until discovery of the injury . . . .

> . . . .

> Although the courts sometimes confuse the term "cause of action" and "right of action" and state that a right of action at law arises from the existence of a primary right in the plaintiff, and an invasion of that right by some delict on the part of the defendant, in a legal sense, these terms are not synonymous or interchangeable. A right of action is the right to presently enforce a cause of action—a remedial right affording redress for the infringement of a legal right belonging to some definite person; a cause of action is the operative facts which give rise to such right of action. The right of action does not arise until the performance of all conditions precedent to the action, and may be taken away by the running of the statute of limitations, through an estoppel, or by other circumstances which do not affect the cause of action. There may be several rights of action and one cause of action and rights may accrue at different times from the same cause.

> Under *Teeters*, decedent had only a "cause of action" which had the potential to ripen into a "right of action". [sic] She had no present right to sue until her action accrued, discovery being a condition precedent to the action. On the effective date of the Act, decedent had not discovered her injury; her right of action under *Teeters* had not accrued.

---

**6.** This cause-of-action/right-of-action distinction is not discussed by the Tennessee Supreme Court in the later *Foster* case, but neither is the distinction inconsistent with *Foster*. The Tennessee Supreme Court declined to review the court of appeals' decision in *Jones*.

The right of action which had been vested under prior law had expired....

*Jones,* 595 S.W.2d 820–21.

Applying *Foster,* it could be argued that the plaintiff's cause of action against these debtors accrued postpetition when she was informed of possible malpractice. This was when the "occasion, the manner and means" of a breach of duty was discovered. *Foster,* 633 S.W.2d at 305.

Applying *Jones,* the plaintiff had a prepetition "cause of action" when the negligent treatment occurred and a "right of action" accrued postpetition when she discovered the possible malpractice.

After much effort, it is clear that analysis of Tennessee limitations law is not productive of when a "right to payment" exists for bankruptcy purposes. The statute of limitations cases do not concern the same issues or the same principles. That the Tennessee legislature would limit access to the courts for redress of a wrong does not illuminate when the underlying right of redress became cognizable for bankruptcy purposes.

State statutes of limitation have other significance in bankruptcy. If a limitation has expired, the underlying claim, though cognizable in bankruptcy, may not be *allowable.* Section 502(b)(1), reproduced in full above, provides that a claim is not allowed to the extent that "such claim is unenforceable against the debtor ... under ... applicable law...." Disallowance is appropriate if the claim is unenforceable against the debtor by reason of "usury, unconscionability, or failure of consideration...." H.R.REP. NO. 595, 95th Cong., 1st Sess. 352 (1977), *reprinted in* 1978

U.S.CODE CONG. & AD.NEWS 5963, 6308; S.REP. NO. 989, 95th Cong., 2d Sess. 62 (1978), *reprinted in* 1978 U.S.CODE CONG. & AD.NEWS 5787, 5848. Statutes of limitation are an example of "applicable law" which might render a claim unenforceable against a debtor and not allowable. *See General Electric Credit Corp. v. Dunn,* 50 B.R. 664, 666 (Bankr.W.D.N.Y. 1985).[7]

That a claim is not *allowable* because a statute of limitation has expired does not defeat the *existence* of the claim in bankruptcy. Quite the contrary: the existence of the claim must be determined independent of limitations questions else the process of *allowance* under § 502 becomes redundant if not circular.

I believe that the 1978 Bankruptcy Code recognizes a "right of payment" for the victim of a debtor's prepetition misconduct at the earliest point in the relationship between victim and wrongdoer. Though this right to payment may not be manifested as a right of access to other courts and though it be unmatured and contingent, it is a charge upon the wrongdoer and a demand inherent in the victim from the moment of the wrongful act. I am guided to this conclusion by important principles:

(1) There is a strong public policy favoring compensation for hurt people.

(2) There is a strong federal policy favoring the debtor's fresh start in bankruptcy.

(3) There is a strong federal policy favoring the equitable distribution of the assets of a Chapter 7 debtor.

The holding that victims of prepetition negligence have "claims" in bankruptcy serves all three principles.[8] These are indi-

---

**7.** In *Dunn,* a state statute of limitations for conversion expired and the victim was held barred to maintain a dischargeability action against the debtor under 11 U.S.C. § 523(a)(6). To reach this conclusion, the court states: "The conversion action objecting to discharge was commenced ... some six years after the event and is beyond the statute of limitations. Therefore, Dunn's obligation, if any, ... is not a "claim" or "debt" to which an objection to discharge may be made under 11 U.S.C. § 523 since such a claim is not enforceable and not in need of discharge." *Id.,* 50 B.R. at 666. The

quotation may go further than necessary to accomplish the holding in *Dunn.* The running of the statute of limitations results in disallowance of the claim, but does not require that the obligation is not a claim or debt for bankruptcy purposes.

**8.** The effect on principle 1 is less clear. If the debtor/tortfeasor is a corporation, the victim of prepetition misconduct must argue for the existence of a prepetition claim if it is to receive compensation from the estate, because the entity will effectively cease to exist after bankrupt-

vidual Chapter 7 cases. A fresh start for these debtors is impossible if the victims of prebankruptcy negligence cannot be addressed in this case. Allowing those injured by the debtor's prepetition conduct to share in prepetition assets is consistent with the strong policy favoring compensation for injuries and is essential to the equitable distribution of these estates. No obvious interest of the State of Tennessee or of the United States Congress is served by allowing victims of prepetition misconduct to pursue the debtor after bankruptcy while not allowing them to share in the (prepetition) estate. Such an outcome at least violates principles (2) and (3) above.[9] Given the different goals of state law and the Bankruptcy Code, it is consistent that a prepetition tort victim may not sustain a lawsuit in Tennessee until discovery of injury but may share in the debtor's estate and may be discharged.[10]

There is support for this construct of "claim" in the decisions of the United States Court of Appeals for this circuit. In 1964 the Sixth Circuit recognized that claims exist for bankruptcy purposes which cannot be enforced through judicial proceedings in a state court. In *Leeds*, a Delaware corporation doing business in Tennessee without qualifying as a foreign corporation asserted a contract claim against a debtor in bankruptcy. Applying Tennessee law to determine whether a claim existed, the Sixth Circuit found that "contracts and transactions of nonqualifying foreign corporations are ... unenforceable in the [Tennessee] courts in actions initiated by the offending corporation." *Leeds*, 332 F.2d at 650. However, "the fact that the state courts may refuse to enforce the claim has no bearing in the bankruptcy proceeding. Once it is determined that a claim exists, then federal law is applied to

determine whether it should be allowed." *Id.* The court held that the Delaware corporation had a claim because its contract with the debtor was not "void," there was simply no access to the Tennessee courts to redress its breach. *Id. See also In re Spanish Trails Lanes*, 16 B.R. 304 (Bankr. D.Ariz.1981) (same).

The same principle is at work in this case. The Tennessee cases cited by Roach concern enforcement of tort claims in other courts. A tort victim's rights are not "void" prior to discovery in Tennessee; those rights are merely unmatured and thus not enforceable in the state courts until the elements described in *Foster* coalesce.

The Sixth Circuit has explored the policies favoring access by the victims of tortious conduct to the tortfeasor's assets (here, insurance coverage) notwithstanding the contrary implication of state statutes of limitations. In *Insurance Co. of North America v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212 (6th Cir.1980) *cert. denied*, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981), the court faced the question whether "manifestation of injury" or "exposure" triggered coverage for "bodily injury" under insurance policies issued to asbestos manufacturers. The insurance companies advocated the manifestation theory; the asbestos manufacturers argued for exposure.

The Sixth Circuit determined that exposure was the appropriate benchmark from which "bodily injury" was measurable. The court made these relevant observations:

> Here, we find that the policy considerations are the opposite of those present in the statute of limitations cases.... it is

---

cy. Herein, the plaintiff argues to the contrary on the theory that she is better off pursuing these individual debtors' postpetition earnings and foregoing a share in the (prepetition) estate, because these debtors will exist and have earnings after bankruptcy. The definition of "claim" for bankruptcy purposes should not depend on the form of entity of the debtor. The existence of a claim certainly should not depend

on whether the estate has assets or on the victim's appraisal of the likely success of postbankruptcy collection efforts. *See* Baird and Jackson, *Kovacs and Toxic Wastes in Bankruptcy*, 36 STAN.L.REV. 1199, 1208–12 (1984).

**9.** *Id.*

**10.** *See supra* note 1.

the injury and not its discovery that makes the manufacturer liable in the underlying tort suit.... such underlying liability should also trigger insurance coverage. We disagree with appellant's argument that identical language used in statutes of limitations and insurance policies must necessarily be interpreted identically. Linguistic uniformity should not dictate how contracts or statutes are interpreted. Statutes of limitation are meant to protect defendants against stale claims, not bar injured plaintiffs who have acted in good faith. Insurance contracts are meant to cover the insured....

. . . .

It should make no difference *when* the bodily injury happens to become compensable.... we see nothing in the policy which requires that the underlying plaintiffs' cause of action accrue within the policy period. There exists a clear distinction between when bodily injury occurs and when the bodily injury which has occurred becomes compensable.

*Forty-Eight Insulations,* 633 F.2d at 1220–23 (footnote omitted).

■ Though we are not here interpreting the language of a contract, the analysis in *Forty-Eight Insulations* is compelling: The policies that guide interpretation of the Bankruptcy Code are served by the conclusion that a claim arises at the time of the negligent act, notwithstanding that access to other courts or the running of a statute of limitation may be timed from some other point in the relationship between tortfeasor and victim. This same logic forms the Sixth Circuit's holding in *Forty-Eight Insulations.*

In *Kovacs,* the Sixth Circuit held that "right to payment" is broadly interpreted to include the State of Ohio's efforts to force a debtor to clean up a waste disposal facility. The court rejected Ohio's argument that a state court injunction was an equitable remedy involving no "right to payment" and thus not a "claim." It held that an injunction requiring an individual debtor to clean up a waste dump could

involve the use of the debtor's income and constituted a claim. *Kovacs,* 717 F.2d at 984. The Supreme Court affirmed. *Id.,* 469 U.S. at —, 105 S.Ct. at 709, 83 L.Ed.2d at 656 ("... it is apparent that Congress desired a broad definition of a 'claim' ").

Several cases from other circuits address when a "right to payment" arises. *See In re Amatex Corp.,* 755 F.2d 1034 (3d Cir. 1985); *Frenville,* 744 F.2d at 332; *In re UNR Industries, Inc.,* 725 F.2d 1111 (7th Cir.1984); *Johns-Manville,* 36 B.R. at 743. There has been much secondary discussion of this issue, especially related to the asbestos and toxic tort bankruptcies. *See, e.g.,* Olick, *Chapter 11—A Dubious Solution to Massive Toxic Tort Liability,* XVIII Forum 361 (March 1983); Roe, *Bankruptcy and Mass Tort,* 84 COLUM.L.REV. 846 (1984) Note, *The Fairness and Constitutionality of Statutes of Limitations in Toxic Tort Suits,* 96 HARV.L.REV. 1683 (1983); *Case Study, In re M. Frenville Co., Inc.,* 5 BROKEN BENCH REV. 17 (March 1986).

The Seventh Circuit in *UNR Industries,* declined to appoint a representative for asbestos claimants, but the court also refused to hold that future asbestosis victims are without claims in bankruptcy. The court states:

Since some potential claimants might be discouraged by the fact that [the lower court], in refusing to appoint a representative for them, expressed the view that they have no rights in bankruptcy, we emphasize that the correctness of his view (criticized in Roe, *Bankruptcy and Tort: The Problem of Mass Disaster,* 84 Colum.L.Rev. (forthcoming 1984)) is an open one in our minds.

*UNR,* 725 F.2d at 1118–19.

Judge Lifland's insightful and much-debated footnote in *Johns-Manville Corp.,* recognizes that "claim" for bankruptcy purposes may include tort victims not yet aware of their injuries:

It is the view of this Court that the declarations ... that these future claims are nondischargeable in bankruptcy are based on superannuated and considera-

bly narrow notions of what constitutes a claim dischargeable in bankruptcy. These notions are at odds with the expanded definition of "claim" contained in Section 101(4) of the Code. In enacting the Bankruptcy Code, Congress specifically intended to afford the broadest possible scope to the definition of "claim" so as to enable Chapter 11 to provide pervasive and comprehensive relief to debtors. The legislative history of Section 101(4) explains:

> The effect of the definition [of claim] is a significant departure from present law [under the former Bankruptcy Act]. Under present law, 'claim' is not defined in straight bankruptcy. Instead it is simply used, along with the concept of provability in section 63 of the Bankruptcy Act, to limit the kinds of obligations that are payable in a bankruptcy case. The term is defined in the debtor rehabilitation chapters of [the Bankruptcy Code] far more broadly. *The definition in paragraph (4) adopts an even broader definition of claim.... The definition is any right to payment, whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured....* The definition also includes as a claim an equitable right to performance that does not give rise to a right to payment. *By this broadest possible definition, and by the use of the term throughout the title 11, especially in subchapter I of chapter 5, the bill [Bankruptcy Code] contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case. It permits the broadest possible relief in the bankruptcy court.*

House Report. No. 95–595 to accompany H.R. 8200 95th Cong. 1st Sess. 309 (1977), pp. 308–314, U.S.Code Cong. & Admin.News 1978, pp. 5787, 6265–6271 (emphasis supplied).

In this reorganization case, that a vast group of future claimants will exist is a statistical certainty, with projections differing only as to the precise quantity and size of these claims. These claims were and remain the *raison d'etre* for the filing here. Accordingly, the *Amatex* and *UNR* Court [sic] refusal to declare future claims cognizable in bankruptcy not only ignores the reality of their existence and importance, but also runs contrary to Congress' intention in drafting Code Section 101(4) that all obligations of the debtor should be dealt with in a Chapter 11 case.

*Johns-Manville,* 36 B.R. at 754–55 n. 6.

The Third Circuit has three times wrestled with the definition of "claim." In *Amatex,* the court faced the question whether individuals exposed to asbestos who have no symptoms of asbestosis are entitled to a voice in the reorganization of an asbestos manufacturer. *Amatex,* 755 F.2d at 1034. The bankruptcy judge refused appointment of a legal representative on the theory that future claimants were not "creditors." The Third Circuit reversed and ordered the appointment of a representative, reserving the question whether future claimants are creditors:

> [The bankruptcy court] believed, future claimants are not "creditors".... We need not reach the merits of these conclusions in order to ascertain that future claimants do have a sufficient interest to require some representation during the reorganization proceedings. Whether or not future claimants have claims in the technical bankruptcy sense that can be affected by a reorganization plan, such individuals clearly have a practical stake in the outcome of the proceedings.

*Amatex,* 755 F.2d at 1041.

Interpreting § 77 of the Bankruptcy Act of 1898, the Third Circuit has held that asbestos-related personal injury actions arising under the Federal Employers' Liability Act, 45 U.S.C. § 51 *et seq.* (1982) ("FELA") do not constitute bankruptcy claims until manifestation of injury. *Schweitzer v. Consolidated Rail Corp.*

*(CONRAIL),* 758 F.2d 936 (3d Cir.) *cert. denied sub nom. Reading Co. v. Schweitzer,* — U.S. —, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985). In *Schweitzer,* the Third Circuit cites *In re Radio-Keith-Orpheum Corp.,* 106 F.2d 22 (2d Cir.1939), *cert. denied,* 308 U.S. 622, 60 S.Ct. 377, 84 L.Ed. 519 (1940), for the proposition that "under certain circumstances, a person may hold a "contingent" claim and thereby be a "creditor" within the meaning of the Bankruptcy Act, even though he presently has no cause of action against the debtor." *Schweitzer,* 758 F.2d at 942.[11] The court reflects briefly on the possibility that a cause of action may exist before it has vitality under applicable law.[12] However, in the context of the FELA action presented in *Schweitzer,* the Third Circuit declined to apply *Radio-Keith-Orpheum:*

> The reasoning in *Radio-Keith-Orpheum* is not controlling here, however, because we do not believe plaintiffs had "interests" of any character before injury manifested itself. In our view, before one can have an "interest" which is cognizable as a contingent claim under section 77, one must have a legal relationship relevant to the purported interest from which that interest may flow. *Cf. Avellino & Bienes v. M. Frenville Co., Inc. (In re M. Frenville Co., Inc.),* 744 F.2d 332 (3d Cir.1984) (no contingent claim pursuant to 11 U.S.C. § 101(4) (1982) unless a "right to payment" or a "right to an equitable remedy" exists).

> In *Radio-Keith-Orpheum,* although there had been no breach of the lease agreement and thus there was no present cause of action pursuant to the guaranties, there was a guarantor-guar-antee legal relationship from which an interest in the guaranty could flow. There is no legal relationship, however, between a tortfeasor and a tort victim until a tort actually has occurred. The tortfeasor-victim legal relationship arises simultaneously with the cause of action in tort. Since we have said that there is no tort under F.E.L.A. until injury manifests itself, it follows that there was no legal relationship between plaintiffs and defendants relevant to plaintiff's future causes of action in tort from which an "interest" could flow.

*Schweitzer,* 758 F.2d at 943.

In *Schweitzer,* the Third Circuit relies on its earlier holding in *Frenville,* 744 F.2d at 332. Avellino & Bienes ("A & B"), a CPA firm, prepared financial statements for the debtor. After the debtor was forced into bankruptcy, four banks sued A & B alleging negligent and reckless preparation of the financial statements. A & B sought relief from the stay to bring an action for indemnification or contribution from the debtor. The Third Circuit stated the issue:

> We must decide today whether the automatic stay of § 362(a) of the Code is applicable when the debtor's acts which form the basis of a suit occurred pre-petition but the actual cause of action which is being instituted did not arise until after the filing of a bankruptcy petition.

*Frenville,* 744 F.2d at 334.

Examining New York law, absent a contract of indemnity or contribution, a defendant can only institute a third-party claim "against a party who may be liable to him for all or part of the plaintiff's claim after service of his answer." *Frenville,* 744 F.2d at 337. The Third Circuit con-

---

**11.** In *Radio-Keith-Orpheum,* the Second Circuit held that landlords were "creditors" notwithstanding that the leases at issue were not in default and there was no prospect of future default. The Second Circuit noted that in a proceeding under § 77(b) of the Bankruptcy Act "creditors" includes "all holders of claims of whatever character ... whether or not such claims would otherwise constitute provable claims under this title." *Id.,* 106 F.2d at 26. The court found that even though the debtor's guarantees of the leases were "wholly contingent and indeterminate in amount" the land-lords had claims that could be treated by the plan of reorganization. *Id.*

**12.** *We assume, without deciding, that under certain circumstances a cause of action may withstand a motion to dismiss for failure to state a claim though the action has not "accrued" within the meaning of the relevant statute of limitations and, thus, a cause of action may "exist" before it has "accrued."*
*Schweitzer,* 758 F.2d at 942.

cludes that A & B had no prepetition claim against the debtor because the bank's action was commenced after bankruptcy and A & B could not have sued the debtor before it was sued by the bank.

*Schweitzer* and *Frenville* confuse the existence of a present right of action or access to the courts with the existence of a "claim" for bankruptcy purposes. The statutory (FELA) right of action in *Schweitzer* had not matured at the time of the bankruptcy filing. A & B's lawsuit for indemnity was not available at the time *Frenville* filed bankruptcy. However, the prematurity of these rights of action is not outcome determinative of the existence of a claim in bankruptcy. *Frenville* has been criticized for failing to differentiate access to the courts and "claim" in bankruptcy. *See Baldwin-United Corp. v. Named Defendants*, 48 B.R. 901, 13 COLLIER BANKR.CAS.2d (MB) 180 (Bankr.S.D.Ohio 1985).[13] This distinction was clearly recognized by this circuit in *Leeds*.

<hr>

13. In *Baldwin-United,* Judge Newsome declined to follow *Frenville* on this reasoning:

> Our disagreement with that decision flows from the Court's failure to distinguish between "claim" as defined in 11 U.S.C. § 101(4) and a cause of action for indemnity or contribution under state law. While the Third Circuit acknowledges the all-encompassing definition of "claim" under § 101(4), it nonetheless holds that the claim for indemnity or contribution arose at the same time that a cause of action arose.
>
> While the third party cause of action of the accounting firm in *Frenville* may not have arisen under New York state law until *after* the petition was filed, its claim for bankruptcy purposes arose *before* the petition was filed. This is so because a "right to payment" under the definition of "claim" includes obligations which are neither matured, nor liquidated, nor fixed. 11 U.S.C. § 101(4)(A).

*Baldwin-United,* 48 B.R. at 903. *See also Yanks,* 49 B.R. at 56.

*Frenville* should also be contrasted with *Employees' Retirement System of Hawaii v. Osborne (In re THC Financial Corp.),* 686 F.2d 799 (9th Cir.1982). In *THC* prior to bankruptcy, the debtor became contractually bound to indemnify a mortgageholder for any losses which might result from the mortgageholder's consent that any foreclosure sale would be subject to the rights of tenants. The property was eventually sold free of the tenants' interests and a tenant sued the mortgageholder for breach of the agreement to protect the rights of tenants in the event of foreclosure. By the time of this suit, THC was in bankruptcy. The mortgageholder asserted a cause of action against the debtor under the indemnification agreement.

The bankruptcy court held that even though the indemnification claim "did not mature until after the bankruptcy petition was filed" the claim "existed as a contingent claim since the attornment and indemnification agreements were entered into [before bankruptcy]." *THC,* 686 F.2d at 802. On appeal, the Ninth Circuit sustained this position as follows:

> We have little guidance in determining whether ERS's indemnification claim existed as a contingent claim in 1976 or did not arise until some later date. But the cases which have been decided, together with the structure and purpose of the Bankruptcy Act, suggest that any doubts should be resolved in favor of finding that a contingent claim existed.
>
> The Supreme Court first allowed a contingent claim against a bankrupt even before the Act specified that such claims were allowable. In *Maynard v. Elliott,* 283 U.S. 273, 51 S.Ct. 390, 75 L.Ed. 1028 (1931), the Court concluded that a contingent claim should be allowed, noting that questions involving the allowability of claims
>
> > should be resolved in light of the purpose of the Act "to convert the assets of the bankrupt into cash for distribution among creditors and then to relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes."
>
> 283 U.S. at 277, 51 S.Ct. at 392, 75 L.Ed. at 1031 (quoting *Williams v. United States Fidelity and Guaranty Co.,* 236 U.S. 549, 35 S.Ct. 289, 59 L.Ed. 713 (1915)). *See also Brown v. O'Keefe,* 300 U.S. 598, 57 S.Ct. 543, 81 L.Ed. 827 (1937)....
>
> ....
>
> In light of the policy of the Bankruptcy Act promoting disposition of as many claims against the debtor as possible, and the power of the court to liquidate or estimate claims, the bankruptcy court's characterization of ERS's claim as an allowable contingent claim was well within its discretion.

*Id.,* at 802–03.

The indemnitee with a contractual right of indemnification in *THC* and the indemnitee with a "common law" right of indemnification in *Frenville* both have been harmed by the same prepetition conduct and both have a "right to payment." The "interest" that the harmed party has in the debtor is the same. The only difference between the rights of the indemnitees in *Frenville* and *THC* is the point at which each has access to the state courts. As argued above, access to the courts is not alone an appropriate benchmark for determining the existence of a "claim" for bankruptcy purposes.

More basically, this court disputes the proposition offered by the Third Circuit that "there is no legal relationship ... between a tortfeasor and a tort victim until a tort actually has occurred." *Schweitzer*, 758 F.2d at 943. The sentence itself is a tautology. There is contact and effect between tortfeasor and victim at the time of commission of the injurious act. The victim of negligence has an "interest" in the negligent party though judicial redress of the wrong must await the accrual of other facts. This interest is "contingent" and "unmatured" but it is a significant personal right of the victim which may mature into a traditional action in court.[14]

In conclusion, a right to payment and thus a claim arose at the time of the debtors' prepetition misconduct. Plaintiff's postpetition state court action against the debtors was prohibited by the automatic stay. 11 U.S.C. § 362 (1982 ed.).

An appropriate order will be entered.

---

**14.** That the victim of negligence has a "contingent" claim for bankruptcy purposes has been discussed in one of the leading decisions on the definition of contingent claims in bankruptcy. *In re All Media Properties, Inc.*, 5 B.R. 126, 6 BANKR.CT.DEC. (CRR) 651, 2 COLLIER BANKR.CAS.2d (MB) 599 (Bankr.S.D.Tex.1980), *aff'd*, 646 F.2d 193 (5th Cir.1981). *All Media Properties*, cited favorably by the Third Circuit in *Frenville*, explains the contingent nature of contract and tort claims as follows:

The court concludes that claims are contingent as to liability if the debt is one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger the liability of the debtor to the alleged creditor and if such triggering event or occurrence was one reasonably contempled by the debtor and credi-

tor at the time the event giving rise to the claim occurred.

Thus, in the case of the classic contingent liability of a guarantor of a promissory note executed by a third party, both the creditor and guarantor knew there would be liability only if the principal maker defaulted. No obligation arises until such default. *In the case of a tort claim for negligence, the parties at the time of the alleged negligent act would be presumed to have contemplated that the alleged tortfeasor would be liable only if it were so established by a competent tribunal. Such a tort claim is contingent as to liability until a final judgment is entered fixing the rights of the parties.*

*All Media Properties*, 5 B.R. at 133 (emphasis added).