In re PETTIBONE CORPORATION, et al., Debtors.

PETTIBONE CORPORATION, Debtor-in-Possession, Plaintiff,

v.

Edwin R. RAMIREZ, Defendant.

Bankruptcy No. 86 B 1563.
Adv. No. 87 A 0243.

United States Bankruptcy Court, N.D. Illinois, E.D.

Aug. 26, 1988.

James L. Nachman, Winston & Strawn, Chicago, Ill., for plaintiff.

Duncan G. Harris, Schiff, Hardin & Waite, Chicago, Ill., for defendant.

MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

JACK B. SCHMETTERER,
Bankruptcy Judge.

The Plaintiff Debtor Pettibone Corporation ("Pettibone") manufactured and sold certain equipment before filing its related petition for relief under Chapter 11. De-

fendant Edwin R. Ramirez ("Ramirez") was injured in an accident involving that equipment after the bankruptcy proceeding was filed. He sued in the District Court of New Mexico to recover damages ("Civil Action").

Count I of Pettibone's Amended Complaint in this Adversary case seeks an injunctive order requiring that Ramirez cease prosecution of his pending Civil Action against Pettibone. Pettibone maintains that the filing and prosecution of the Civil Action violates the automatic stay under § 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a). The order sought is intended to implement the automatic stay.

Count II seeks a new injunction to bar the Civil Action, based on asserted expense and other harm alleged to be irreparable if the Civil Action must be defended.

Count III seeks a declaration that any judgment or settlement as may be rendered in favor of Ramirez in the Civil Action be deemed a mere general unsecured claim that arose before commencement of the Chapter 11 case.

Ramirez filed affirmative defenses [1] and a counterclaim for declaration that his claim is post petition, is not barred by the stay, and can proceed in the New Mexico court.

The parties cross-moved for summary judgment on Counts I and III of the Amended Complaint. Ramirez also moved for summary judgment on his Counter-Claim. He contends that the filing and prosecution of the Civil Action did not violate the stay, and that his claim arose after the commencement of this case. Ramirez also argues that his claim is an administrative expense under § 503(b), and that proper venue for the Civil Action is the United States District Court for the District of New Mexico.

---

[1] The Ramirez Affirmative Defenses are: *First* —breach of fiduciary duties and reasonable business standards, for operating in bankruptcy without liability insurance; *Second*—that his claim is post petition, not stayed under § 362; *Third*—that he would be prejudiced by the requested new injunction; *Fifth* (no fourth defense is alleged)—that he is a paraplegic and it would be inequitable to enjoin him; *Sixth*—that his claim is post petition and can be pursued under 28 U.S.C. § 1409(e); and *Seventh*—that all litigation should be conducted in the New Mexico courts on equitable and jurisdictional grounds.

By agreement of the parties, the Civil Action has been stayed pending this Court's ruling on these cross-motions.

The parties have not questioned that this Court has at least related jurisdiction under 28 U.S.C. § 157(c)(1), and the parties have through their cross motions consented to entry of final judgment by this Court under § 157(c)(2). Moreover, this Court finds that it has core jurisdiction under 28 U.S.C. § 157(b)(2)(A), (B), (G) and (I). The uncontested facts are set forth in the pleadings of the parties and in their filings under Local District Rule 12(e) and (f) and supporting affidavits and other materials filed.

For reasons set forth below, summary judgment is by separate order entered in favor of Ramirez and against Pettibone on Count I of the Complaint, and on Ramirez's counterclaim. The cross motions for summary judgment on Count III are denied.

By separate order, Counts II and III are set for report of status at which the Court will set dates for discovery cut-off and Pretrial conference and trial as to Count II only. For reasons stated in the opinion, Count III will be held in abeyance pending resolution of the Ramirez State Court suit.

## UNDISPUTED FACTS

On or about December 11, 1985 Pettibone completed manufacture of a certain forklift truck (the "Forklift"). On December 11, 1985, Pettibone conducted a final test of that unit. The Forklift was manufactured pursuant to a Contract between the Department of the Air Force and Pettibone. On December 16, 1985, the Department of the Air Force accepted the Forklift and shipped it to Kirkland AFB, New Mexico.

On January 31, 1986, Pettibone filed a voluntary petition for reorganization under Chapter 11 of the Code. Since that date Pettibone has continued in possession of its property and has operated its businesses as a Debtor–In–Possession, pursuant to 11 U.S.C. §§ 1107 and 1108.

Ramirez was hired by the Department of the Air Force on February 18, 1986 to, among other things, operate forklift trucks at Kirkland AFB, New Mexico. On March 4, 1986, Ramirez sustained serious injuries when the Forklift overturned while Ramirez was operating it at that location.

On July 23, 1986, Ramirez filed suit in the United States District Court for the District of New Mexico, captioned *Edwin R. Ramirez v. Pettibone Corp. Inc., doing business through its wholly owned subsidiary Pettibone–Mercury, Inc.* ("Civil Action"). (The Pettibone Mercury subsidiary has been dissolved and is now a division of Pettibone. "Pettibone" as used herein refers to Pettibone and also to Pettibone–Mercury, Inc.).

In his Civil Action, Ramirez alleges that he was injured as a result of negligent design and manufacture of the Forklift by Pettibone. He also alleges that Pettibone failed up to the date of accident to warn him of the Forklift's propensity to overturn, and failed to instruct him in a safe manner for operating it. Ramirez also alleges that Pettibone is liable to him for damages under a theory of strict liability. Thus, the alleged wrongful acts of negligent design and manufacture occurred pre-petition, while the alleged breach of duty to warn and instruct occurred post petition after Ramirez started using the Forklift truck.

There are ten other civil actions pending against Pettibone which involved accidents occurring after the commencement of the related bankruptcy case. Those cases allegedly all involved equipment manufactured before the petition was filed under Chapter 11, though the facts involving those actions are not yet before this Court. Pettibone is without product liability insurance for the defense of or indemnification against claims arising from any incident occurring from and after October 22, 1985 through July 31, 1987. Thus, the Ramirez Civil Action and the other post-petition accidents referred to are not covered by insurance.

While the parties have objected on relevancy grounds to certain of the foregoing facts, those facts have not been contradicted by opposing affidavits or other materials as required under F.R.Civ.P. 56(e) or Local District Rule 12(f) that has been

adopted by and for the Bankruptcy Court. Therefore, they are deemed admitted for purposes of this decision.

## DISCUSSION

### I. *Summary Judgment Standards*

Under Rule 56(c) F.R.Civ.P., summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits showing that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Howland v. Kilquist,* 833 F.2d 639, 642 (7th Cir.1987); *Farries v. Stanadyne/Chicago Div.,* 832 F.2d 374, 378 (7th Cir.1987); *Cameron v. Frances Slocum Bank & Trust Co.,* 824 F.2d 570, 573 (7th Cir.1987); *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656, 659 (7th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987).

The primary purpose for granting a summary judgment motion is to avoid unnecessary trials when there is no genuine issue of material fact in dispute. *Farries,* 832 F.2d at 379; *Wainwright Bank & Trust Co. v. Railroadmens Fed. Sav. & Loan Ass'n of Indianapolis,* 806 F.2d 146, 149 (7th Cir.1986). On a summary judgment motion, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14; *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356; *Howland,* 833 F.2d at 642; *Marine Bank Nat'l Ass'n v. Meat Counter, Inc.,* 826 F.2d 1577, 1579 (7th Cir.1987); *Valley Liquors,* 822 F.2d at 659; *DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir.1987). Moreover, the existence of a material factual dispute is sufficient only if the disputed fact is determinative of the outcome under applicable law. *Anderson,*

477 U.S. at 248, 106 S.Ct. at 2510; *Howland,* 833 F.2d at 642; *Egger v. Phillips,* 710 F.2d 292, 296 (7th Cir.) (en banc), *cert. denied,* 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983); *ITT Indus. Credit Co. v. D.S. America, Inc.,* 674 F.Supp. 1330, 1331 (N.D.Ill.1987).

The standard for granting summary judgment mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a). *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511; *Barry Gilberg, Ltd. v. Craftex Corp.* 665 F.Supp. 585, 589 (N.D. Ill.1987). The primary difference between the two motions is procedural; summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on evidence that has been admitted. *Anderson,* 477 U.S. at 251, 106 S.Ct. at 2511–12. In essence, however, the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require trial or whether one party must prevail as a matter of law. *Id.* at 251–52, 106 S.Ct. at 2511–12. In determining whether the evidence is sufficient, the Court must consider the substantive evidentiary standard that could be applicable at trials (whether preponderance of evidence, clear and convincing, or other). *Valley Liquors,* 822 F.2d at 659.

Of course, a party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motions, and must identify those portions of the "pleadings, depositions, answers to interrogatories, and affidavits, if any", which it believes demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. However, once the motion for summary judgment is made and supported as described above, Rule 56(e) provides that a party opposing the motion may not rest upon the mere allegations or denials in his pleading, but his response must set forth specific facts showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553–54; *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Matsushita,*

475 U.S. at 587, 106 S.Ct. at 1356–57; *Howland,* 833 F.2d at 642; *Valentine,* 802 F.2d at 985; *Shlay,* 802 F.2d at 920. When the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356–57. The Court should not "weigh the evidence." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511; *Valley Liquors,* 822 F.2d at 659. However, "[i]f evidence opposing summary judgment is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511, *Valley Liquors,* 822 F.2d at 659.

### *Cross Motions for Summary Judgment*

■ Although both parties argue for summary judgment, that does not by itself indicate that there are no genuine issues of material fact; the court must rule on each motion separately in determining whether each judgment may be entered in accordance with applicable principles. *ITT Indus. Credit Co. v. D.S. America, Inc.,* 674 F.Supp. 1330, 1331 (N.D.Ill.1987) (Shadur, J.); *District 12, United Workers of Am. v. Peabody Coal, Co.,* 602 F.Supp. 240, 242 (S.D.Ill.1985). See C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2720 (2d ed. 1983 & Supp.1987). Cross-motions for summary judgment do not require the court to decide the case on those motions; the court can deny both motions if both parties have failed to meet the burden of establishing no genuine issue of material fact exists and that they are entitled to judgment as a matter of law. *ITT,* 674 F.Supp. at 1331; *Wolf v. Maryland Casualty,* 617 F.Supp. 456, 458 (S.D.Ill. 1985). See C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2720 (2d ed. 1983 & Supp.1987).

### *Partial Summary Judgment*

Rule 56(d), F.R.Civ.P., involves situations in which the motion does not lead to a judgment on the entire case but only terminates further contest of a portion of the litigation. Because Rule 56(d) is part of the rule entitled "Summary Judgment", the order prescribed by this rule has been referred to as "partial summary judgment." C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2737 (2d ed. 1983 & Supp.1987). Partial Summary Judgment is possible in federal pleading when it disposes entirely of one or more of the counts of the complaint. *Biggins v. Oltmer Iron Works,* 154 F.2d 214, 216 (7th Cir.1946); *Capitol Records, Inc. v. Progress Record Distrib.,* 106 F.R.D. 25, 28 (N.D.Ill.1985) (Getzendanner, J.); *Triangle Ink & Color Co., Inc. v. Sherwin–Williams Co.,* 64 F.R. D. 536, 537–38 (N.D.Ill.1974).

### II. *The Issues to be Decided in Count I and the Counterclaim*

The parties seek a ruling in Count I and the Counterclaim as to whether Ramirez holds a pre-petition or post-petition claim against Pettibone. The applicability of the automatic stay to the Civil Action turns on that question.

Under § 362(a)(1), the filing of a petition in bankruptcy operates as a stay of—

the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor *that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title* (Emphasis added).

Ramirez was injured after the commencement of the related bankruptcy case. Neither of the parties contends that Ramirez could have commenced his Civil Action before the commencement of that case because he wasn't injured until afterwards. The issue is whether the Civil Action is nevertheless a "claim" against Debtor that "arose before the commencement of the case" so as to apply the automatic stay.

To classify the claim as pre-petition may also have other consequences. Most importantly, pre-petition claims are discharged under § 1141(d)(1)(A) and subject to the post-confirmation injunction of § 524(a). If the claim is found to be post-petition but non administrative, the order confirming plan or plan may allow the claimant to seek

full recovery against the reorganized Pettibone.[2] Thus, the holder of a pre-petition claim against a Chapter 11 debtor may recover less on its claim than a party holding a post-petition claim. Similarly injured claimants may thereby receive disparate treatment simply because of happenstance in their being injured before or after the bankruptcy filing date. Finally, the potential for Debtor to reorganize may be impaired by a finding that claims are postpetition.

This Court must decide whether to treat the Ramirez claim as having arisen before the commencement of the case, even though the claimant's cause of action had not yet accrued under nonbankruptcy law. There are differences among reported authorities and the status of unaccrued tort claims is unsettled. *Bibler, The Status of Unaccrued Tort Claims in Chapter 11 Bankruptcy Proceedings,* 61 The American Bankr.L.J. 145 (Spring, 1987). Some authorities find that a claim in bankruptcy arises only when a cause of action arises under state law. *See e.g. Matter of Frenville Co., Inc.,* 744 F.2d 332 (3d Cir.1984), *cert. denied* 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985). *Accord In re Tonty,* 52 B.R. 18 (Bankr.W.D.Pa.1985). If that were the only precedent, it would decide this case. However, other authorities have criticized *Frenville* and approached the problem with different analysis. As background for this decision, there follows a description of the latter authority.

III. *The Code's Expanded Definition of "Claim" and the Majority Rule Outside the Mass Tort context*

Under the Bankruptcy Act ("Act"), a claim such as Ramirez's might not have been allowed in this case. Section 57(d) of the Act provided that:

Claims which have been duly proved shall be allowed upon receipt by or upon presentation to the court, unless objection to their allowance shall be made by parties in interest or unless their consideration be continued for cause by the court upon its own motion: *Provided, however,* that an unliquidated or contingent claim shall not be allowed unless liquidated or the amount thereof estimated in the manner and within the time directed by the court; and such claim shall not be allowed if the court shall determine that it is not capable of liquidation or of reasonable estimation or that such liquidation or estimation would unduly delay the administration of the estate or any proceeding under this Act.

11 U.S.C. § 93(d) (1976) (Emphasis in the original.) In a case where a tort claimant had yet to proceed to trial and the amount of recovery, if any, was uncertain, the claim might be incapable of reasonable estimation. *See, e.g., Matter of Baldwin–United Corp.,* 55 B.R. 885, 897 (S.D.Ohio 1985); and *Gladding Corp. v. Forrer (In re Gladding Corp.),* 20 B.R. 566, 568 (Bankr.D.Mass.1982) (sale of equipment pre-bankruptcy, suit for product defect post confirmation held a nondischargeable post-petition claim). As a result, contingent and unliquidated claims often lacked the requisite provability under the Act. *In re Johns–Manville Corp.,* 57 B.R. 680, 686 (Bankr.S.D.N.Y.1986).

Act § 17, moreover, with exceptions not relevant here, provided that "[a] discharge in bankruptcy shall release a bankrupt from all of his provable debts." 11 U.S.C. § 35(a) (1976). Nonprovable debts were precluded from discharge. *In re Johns–Manville Corp.,* 57 B.R. at 686. Instead, the claimant was able to prosecute his claim after discharge. *Id.*

In the case of tort claims not yet accrued as of the time of the bankruptcy petition, this meant that those claims were often not included in the bankruptcy distribution and discharge. *Roach v. Edge (In re Edge),* 60 B.R. 690, 694 (Bankr.M.D.Tenn.1986). The net effect was an unequal distribution, as creditors holding disallowed claims might later recover in full, while other creditors with provable claims were limited to a share in the distribution from the estate.

---

**2.** *See* discussion below concerning Count III starting at p. 933 regarding requirements for administrative status and claims arising in the period between the filing of a petition under Chapter 11 and the confirmation of the plan.

*Baldwin–United,* 55 B.R. at 898. In addition, reorganized debtors were often burdened with nondischargeable debts. *Johns–Manville,* 57 B.R. at 687. The resultant volume of litigation could threaten or jeopardize a debtor's ability to reorganize. *Id.*

Perceiving that the scope of discharge under the Act was often inadequate, the drafters of the Bankruptcy Code eliminated the concept of provability. *Edge,* 60 B.R. at 693. The House of Representatives Committee on the Judiciary explained its intent as follows:

> H.R. 8200 abolishes the concept of provability in bankruptcy cases. All claims against the debtor, whether or not contingent or unliquidated, will be dealt with in the bankruptcy case. This is the procedure under current chapters IX and X. However, under the liquidation chapters of the Bankruptcy Act, certain creditors are not permitted to share in the estate because of the non-provable nature of their claims, and the debtor is not discharged from those claims. Thus, relief for the debtor is incomplete, and those creditors are not given an opportunity to collect in the case on their claims. The proposed law will permit a complete settlement of the affairs of a bankrupt debtor, and a complete discharge and fresh start.

H.R. 8200, 95th Cong., 1st Sess. § 101(4)(A) (1977), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5963, 6141.

An essential element of the Code's scheme for a broad discharge is its expansive definition of "claim". *Johns–Manville,* 57 B.R. at 686–87. The Senate Report accompanying S. 2266 explains that the definition was intended to encompass contingent and unliquidated claims not provable under the Act.

> Paragraph (4) defines "claim." The effect of the definition is a significant departure from present law. Under present law, "claim" is not defined in straight bankruptcy. Instead it is simply used, along with the concept of provability in section 63 of the Bankruptcy Act, to limit the kinds of obligations that are payable in a bankruptcy case. The term is defined in the debtor rehabilitation chapters of present law far more broadly. The definition in paragraph (4) adopts an even broader definition of claim than is found in the present debtor rehabilitation chapters. The definition is any *right to payment,* whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured. ... By this broadest possible definition and by the use of the term throughout the title 11, especially in subchapter I of chapter 5, the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case. It permits the broadest possible relief in the bankruptcy court.

S. 2266, 95th Cong., 1st Sess. § 101(4) (1977), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 5807–5808. (Emphasis added.)

As enacted, § 101(4) virtually duplicates the language of the Senate Report. Section 101(4) defines a claim as a—

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
>
> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

This broad definition of "claim" is also intertwined with the claims allowance process of § 502. Section 502(c) explicitly provides for the estimation of contingent or unliquidated claims. Under § 502(c):

> There shall be estimated for purpose of allowance under this section—
>
> (1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case; or

(2) any right to payment arising from a right to an equitable remedy for breach of performance.

The interaction of §§ 101(4) and 502(c), along with the operation of the automatic stay under § 362(a), give authority for bankruptcy courts to deal comprehensively with all facets of reorganization. *Johns–Manville*, 57 B.R. at 587.

The concept "right to payment" of an "unmatured claim" is at the core of the issues presented here.

*In re Edge*, 60 B.R. 690 (Bankr.M.D. Tenn.1986), illustrates these issues. The *Edge* plaintiff had received negligent treatment from two dentists before their petitions were filed under Chapter 7. The plaintiff discovered her injury after both petitions were filed, but before the discharge in either case. The plaintiff brought a lawsuit in state court after one of the dentist-debtors had already been discharged. Both debtors moved for sanctions for violation of the stay.

Under applicable state law in *Edge*, a cause of action for malpractice accrued and the statute of limitations began to run at the time a plaintiff discovered, or in the exercise of reasonable care and diligence should have discovered, the resulting injury. Accordingly, plaintiff argued that her claim arose post-petition, upon discovery of her injuries. If the claim were post-petition, the state court action would not be subject to the stay and the plaintiff would presumably be able to recover from the debtors' post-bankruptcy assets.

The *Edge* court rejected this argument and held that a right to payment, and thus a claim, arose at the time of the debtor's pre-petition misconduct when the injury was suffered albeit unknown at the time. Because claimant had received a pre-petition injury, if it had been discovered she would have had a pre-petition "right to payment" under the § 101(4) definition.

The court in *Edge* need not have gone further in order to rule. *Edge*, 60 B.R. at 699. However, that court added in *dicta* that a bankruptcy claim may exist even where the claimant as yet has no access to the judicial system for redress of its wrongs. *Id.* In arriving at this conclusion, the court was especially guided by the bankruptcy policies of the fresh start and equality in the distribution to creditors of a Chapter 7 debtor. *Id.* at 699–700. According to the *Edge* court, a fresh start would be impossible in the case unless claims of pre-bankruptcy negligence could be addressed. *Id.* *Edge* stated that those policies are clear from the legislative history of the treatment of claims in bankruptcy. *Id.* at 692. *Edge* also cited many court decisions which have interpreted the bankruptcy "claim" expansively. *Id.* at 693.

In reaching its conclusion, the *Edge* court commented on the interaction between federal and state law in the determination of claims. According to that court, "(i)t is conceptually difficult to refer to state law to determine when a right to payment arises where by federal law a 'right to payment' spawns a claim notwithstanding that the right is contingent, unmatured, etc." *Id.* at 696. *Edge* recognized a federal standard for determining when a right to payment exists. *Id.* at 700.

A critical aspect of the *Edge* decision and reasoning was its determination that plaintiffs' not-yet-discovered rights existed, but were unmatured under applicable state law at the time of the petition. Thus the unmatured claim fell within the express language of § 101(4). The court also emphasized under § 502(b)(1) that an unenforceable state law claim will not be allowed in bankruptcy *except* when the claim is contingent or unmatured. In other words, contingent or unmatured claims are expressly provided for in the Code's provisions for claims allowance. *Id.* at 694–95.[3] *Edge* interpreted this exception as a Congressional mandate that claims contingent or unma-

---

**3.** Section 502(b)(1) provides that the court shall allow a claim,

    ... except to the extent that—

      (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured.

tured under state law be allowed in bankruptcy. *Id.* at 694–96. *Edge* concluded in further *dicta* that an unmatured or contingent claim arises at the time of a debtor's wrongful act, *Id.* at 699, and that no present right of action is needed for there to be a bankruptcy claim. *Id.* at 704. However, the Court made clear that the wrongful act it was referring to was an act impacting on the tort victim:

I believe that the 1978 Bankruptcy Code recognizes a "right of payment" for the victim of a debtor's pre-petition misconduct *at the earliest point in the relationship between victim and wrongdoer.* Though this right of payment may not be manifested as a right of access to other courts and though it be unmatured and contingent, it is a charge upon the wrongdoer and a demand inherent in the victim from the moment of the wrongful act. *Id.* at 699. (Emphasis supplied.)

Thus neither the ruling nor the *dicta* in *Edge* would apply to this case where the "earliest point in the relationship" between Ramirez and Pettibone occurred post-petition when he went to work using the Forklift.

Outside the mass tort area, most reported cases interpreting the timing of a "right to payment" employ the conduct-based focus used in *Edge.* Notably, the majority of these cases involved claims for contribution or indemnification. The claims in such cases arose out of the debtor's pre-petition conduct. The relationship between debtors and the claimants seeking indemnity also typically existed pre-petition.

Generally, an indemnification claim does not accrue under nonbankruptcy law until a third party brings an action in another court against the indemnitee. *See, e.g., Avellino & Bienes v. M. Frenville Co., Inc. (Matter of Frenville Co., Inc.),* 744 F.2d 332, 335 (3d Cir.1984), *cert. denied sub nom., Frenville Co. v. Avellino & Bienes,* 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985); *In re Black,* 70 B.R. 645, 646–47 (Bankr.D.Utah 1986). Even though the wrongful conduct is pre-petition, there is no cause of action until the third party decides to bring an action against the indemnitee.

The timing of the nonbankruptcy action is therefore within discretion of the third party. If the related bankruptcy claim could not be filed before the third party sued, that third party would control the timing of a bankruptcy claim. Given this fact, bankruptcy courts have refused to find that a bankruptcy claim and nonbankruptcy cause of action for indemnity arise simultaneously. *In re Yanks,* 49 B.R. 56, 58 (Bankr.S.D.Fla.1985) ("It would leave to the vagaries of the timing of events by third parties such obviously crucial issues of bankruptcy relief as priorities of distribution and dischargeability of obligations"). By focusing on the time of the debtor's conduct, rather than the time of the indemnitee's action, these courts have avoided a source of potential manipulation of the bankruptcy process.

The indemnification cases have also involved debtors who are subject to multiple lawsuits stemming from a single set of facts. *E.g., Matter of Baldwin–United Corp.,* 55 B.R. 885 (Bankr.S.D.Ohio 1985). If nonbankruptcy law were used to determine the status of claims, Chapter 11 claimants of equal status would receive unequal payment depending solely on when they learned of their right to indemnification. *Hi–Lo Powered Scaffolding, Inc. v. Penn,* 70 B.R. 606, 611 (Bankr.S.D.Ohio 1987).

Outside the mass tort context, the majority rule is that a claim arises at the time when acts were performed against the injured party that gave rise to the alleged liability. *See In re Johns–Manville Corp.,* 57 B.R. 680, 690 (Bankr.S.D.N.Y.1986) (asbestos panels delivered to and used by claimants pre-bankruptcy). The rule was properly applied in cases like *Edge* and *Johns–Manville,* where the wrongful acts against alleged victims clearly took place pre-petition albeit the damages and harms remained undiscovered until post petition.

The indemnification cases illustrate the advantages in bankruptcy of a rule focusing on the debtor's conduct. Such a rule is consistent and promotes equal treatment of similarly situated creditors. It also discourages manipulation of the timing of claims. By providing for the inclusion of

remote and contingent obligations, more claims can be discharged. This broadened discharge furthers the Congressional bankruptcy policy of a fresh start. Thus, considerations of bankruptcy policy as well as authority support a rule based on the debtor's conduct. *See also, Insurance Co. of North America v. Forty–Eight Installation, Inc.,* 633 F.2d 1212, 1220–23 (6th Cir. 1980), *cert. denied* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981).

However, in indemnification cases as well as *Edge*-type situations, debtor's conduct had to impact pre-petition directly or indirectly on some injured party, either claimant or indemnity claimant, before it was sufficient to generate a pre-petition claim.

### IV. *Classification of Claims in the Mass Tort Context*

In recent years, an unprecedented volume of products liability litigation has caused a number of large manufacturers to file petitions for reorganization under Chapter 11. *Grady v. A.H. Robins Co., Inc.,* 839 F.2d 198, 199 (4th Cir.1988) *("Robins"); In re Amatex Corp.,* 755 F.2d 1034, 1036 (3d Cir.1985); *In re UNR Indus., Inc.,* 71 B.R. 467, 470 (N.D.Ill.1987); *In re Johns–Manville Corp.,* 36 B.R. 743, 745–746 (Bankr.S.D.N.Y.1984), *aff'd,* 52 B.R. 940 (S.D.N.Y.1985). Except for Robins, the above manufacturers were all producers and suppliers of asbestos. Prior to their petitions for reorganization, all (including Robins) had either ceased manufacture of the harmful product, or had enhanced safety procedures so as to minimize their product's deleterious effects.

The bulk of the litigation confronting these manufacturers involved the claims of victims injured pre-bankruptcy but whose injuries had not yet manifested themselves ("future claimants"). The UNR case filed in this District is illustrative. At the time of UNR's petition for reorganization, approximately 17,000 lawsuits arising from asbestos claims were pending against it. The company estimated litigation costs of over $1 Million per month. Over the next 40 years, UNR anticipated an additional 30,000 to 120,000 claims, with an incalculable amount of exposure to damages. If those claims could not be dealt with in a plan of reorganization, UNR believed that it would be forced to liquidate. *UNR Indus.,* 71 B.R. at 744.

The problem in *UNR* was twofold. As in any reorganization, the manufacturers sought resolution of known claims against them. In addition, the manufacturers sought an advance determination as to the way unknown claims should be handled. Basically, the manufacturers sought a means of dealing with both present and future consequences of their pre-bankruptcy conduct which had exposed and injured pre-bankruptcy those many persons whose injuries would not be manifest for many years.

Since the manufacturers were no longer engaged in the harmful practices which precipitated the litigation against them, the issue was raised whether the claims should be classified as pre-petition and discharged, though the question of discharge was not decided. *See, e.g., In re UNR Industries, Inc.,* 29 B.R. 741, 745 (N.D.Ill.1983), *appeal dismissed,* 725 F.2d 1111 (7th Cir.1984).

### A. Grady v. A.H. Robins Co., Inc.

The Fourth Circuit recently considered the claim of a Dalkon Shield user who had been inserted with the intrauterine device a number of years before Robins' petition under Chapter 11. *Grady v. A.H. Robins Inc.,* 839 F.2d 198 (4th Cir.1988). The injury manifested itself at about the time of the petition, although the Fourth Circuit decision treated manifestation as being post-petition. *Id.* Under the applicable "discovery rule" under state law, the plaintiff need not have brought an action against Robins until she knew of the nature of her injuries. *Id.* at 201. Seeking to pursue her action outside the bankruptcy court, plaintiff argued that she held a post-petition claim not subject to the automatic stay. *Id.* The plaintiff based this conclusion on the fact that she had no known cause of action under state law until after Robins had filed for reorganization. *Id.*

The Fourth Circuit affirmed the bankruptcy court's decision that the plaintiff

held a pre-petition claim subject to the stay. *Id.* at 203. Both decisions state that a right to payment arose at the time the plaintiff was inserted with the Dalkon Shield. *Id.* *See also, In re A.H. Robins Co., Inc.*, 63 B.R. 986, 993 (Bankr.E.D.Va. 1986), *aff'd sub nom., Grady v. A.H. Robins, Inc.*, 839 F.2d 198 (4th Cir.1988). The Fourth Circuit concluded that such a claim clearly fell within the definition of "contingent" claims, as all acts constituting the tort including impact on the victim had occurred prior to the Robins petition. *Id.* at 202–203. At the time of the petition, the plaintiff's right to payment depended solely on manifestation, a contingent event. *Id.*

Although the Fourth Circuit based its conclusion on the plain language of the statutory definition of claim, it discussed with approval the concerns addressed by the bankruptcy court. In particular, the Fourth Circuit noted the importance of the automatic stay and the need to let federal law control the allowance of claims. *Id.* at 201–202. The Dalkon Shield litigation involved claimants from all over the country. If the timing of each individual's claim was determined under state law, many actions would not be subject to the stay. *Id.* at 202. A federal standard for determining the timing of a claim, and hence, the applicability of the stay, would avoid the detrimental effect on the reorganized company of many proceedings simultaneously in courts across the nation. *Id.* Thus, the importance of a uniform federal standard supports the conclusion in *Robins,* as does the fact that the acts of negligence and impact on the injured plaintiff had all occurred pre-petition.

The Fourth Circuit, however, took care to emphasize the narrowness of its opinion. *Id.* at 199, 203. In particular, the opinion did not decide whether plaintiff's claim was dischargeable or whether the claim was an administrative expense. *Id.* The opinion's effect is limited to the applicability of the stay under § 362(a). *Id.*

Because the *Robins* holding is limited in this way, the decision is not declarative of the rights of future claimants who do not discover their injury until after confirmation of the company's plan. While *Robins* solved the immediate problem regarding the automatic stay, it left unanswered the important questions of discharge and priority in distribution. Thus, *Robins* is an incomplete declaration of the status of contingent but unaccrued tort claims in bankruptcy. As described below, moreover, the asbestos cases have made no declaration on this issue.

### B. The asbestos cases

Due to the nature of asbestos-related injury, it is difficult to ascertain the point at which injury occurs. Asbestosis is a slowly progressive disease. While the initial tissue damage occurs shortly after inhalation of asbestos fibers, the resultant injury may not manifest itself until many years after exposure. Because many victims would find their claims time-barred if initial exposure commenced the running of the statute of limitations, most courts use a manifestation theory to determine the time that a cause of action arises. *See Insurance Co. of North America v. Forty–Eight Insulations,* 633 F.2d 1212, 1220 (6th Cir. 1980). Under the manifestation rule, injury may exist, but there generally is no related cause of action until the victim becomes aware of his disease. *Matter of UNR Industries, Inc.,* 725 F.2d at 1119.

Asbestos manufacturers in reorganization are aware that much of the litigation against them involves future claimants who as yet have no cause of action in nonbankruptcy courts. Despite the pressing need to deal with these claims, the three major cases have not reached a decision on the status of future claims. Instead, each case has employed a procedure which provides representation for future claimants without declaring their rights.

All three major cases have allowed the appointment of a legal representative to advance the interests of future claimants in the development of the plan. *Johns–Manville,* 36 B.R. at 757. The authority for

such appointment is found in § 1109(b)[4], which allows a "party in interest" to be heard in a case under Chapter 11. Since the term "party in interest" is not limited to the examples listed in § 1109, future claimants were found to possess a sufficient stake in the proceeding to be classified as such. *Amatex*, 755 F.2d at 1042. Notably, classification as a party in interest would not necessarily have the effect of binding a party to a plan.

In the *Amatex* and *UNR* cases, appointment of representatives followed an earlier decision that future claimants did not hold claims cognizable in bankruptcy. *In re Amatex Corp.*, 30 B.R. 309 (Bankr.E.D.Pa. 1983); *UNR Indus.*, 29 B.R. at 745–46. The *Amatex* Court also reasoned that such claims were nondischargeable.

In reversing the lower court *Amatex* decision, the Second Circuit expressed some concern that it was premature to decide the issue of dischargeability. *In re Amatex Corp.*, 755 F.2d at 1043. The Seventh Circuit has expressed similar hesitancy on the discharge issue. *UNR Indus.*, 725 F.2d at 1119–21. Both circuits would defer resolution of the issue until a plan was more developed. To date, the Seventh Circuit has not reconsidered its statement that the question is an open one. *Id.* at 1119.

It is very possible that the asbestos cases will not decide the status of unaccrued tort claims. Johns–Manville has already emerged from reorganization without having done so. *Matter of Johns–Manville Corp.*, 68 B.R. 618, 628 (Bankr.S.D.N.Y. 1986). ("Whether these parties in interest have claims that are cognizable in a reorganization proceeding, however, is not an issue which needs to be determined in order to confirm this Plan.") As did Johns–Manville, UNR also plans to deal with future claimants through use of a trust vehicle. If these provisions withstand constitutional attack[5], there may be no need to classify future claims as pre-petition or post-petition.

The asbestos cases illustrate the dilemma faced by courts dealing with unaccrued tort claims. In those cases, it is obvious that there may be no reasonable prospects for reorganization unless claims can be dealt with in the reorganization plan. Where the going concern value of the corporation exceeds its liquidation value, liquidation would yield less, or even eliminate the tort victims' recovery. *Johns–Manville*, 36 B.R. at 746. Thus, if the operations of the reorganized debtor promise to be profitable, it benefits the debtor and its creditors to deal with future claims in a reorganization plan.

On the other hand, many future claimants are unaware of their unaccrued rights against these debtors. It arguably offends due process to bind these claimants to a plan without notice. At least two Circuit Courts have in fact found § 1141(d)(1)(A) unconstitutional where creditors had insufficient notice of a bankruptcy case to file a claim. *Broomall Indus. v. Data Design Logic Sys.*, 786 F.2d 401 (Fed.Cir.1986); *Reliable Elec. v. Olson Constr.*, 726 F.2d 620 (10th Cir.1984).

The type of notice needed to inform all future claimants of a manufacturer's reorganization is quite difficult to conceive. Inadequate notice was the reason for the opinion in this District which refused to allow appointment of a legal representative in *UNR*. *UNR Indus.*, 29 B.R. at 748. That opinion was based on the court's conclusion that statutory and constitutional rights of future claimants cannot be subordinated to the bankruptcy "fresh start". *Id.* That ruling was appealed and the appeal dismissed, so the *UNR* opinion has never been overruled.

---

**4.** Section 1109(b) provides that:

a party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter.

**5.** The initial due process objections to the Johns–Manville Plan were rejected at the time of confirmation. *Matter of Johns–Manville Corp.*, 68 B.R. 618, 626–27 (Bankr.S.D.N.Y. 1986). Since then, the Second Circuit has twice upheld the Plan's procedure for dealing with unaccrued claims.

The mass tort cases illustrate the difficulty in deciding when a "right to payment" or "claim" arises in bankruptcy. Although it provides uniformity to focus on the time of the acts giving use to liability, such a declaration may produce undesirable collateral effects. This is especially true in cases such as the asbestos cases, where the victim's unawareness of the claim presents due process problems of notice. Thus, the solutions emerging from the asbestos cases suggest a pragmatic effort to accommodate bankruptcy policies with the statutory and constitutional rights of victims of mass torts. Those problems, however, do not face the Court in this case.

## V. *Application of the Above Principles to Count I and the Counterclaim*

### A. Claims based on failure to warn

■ One of Ramirez's theories is an asserted breach of duty to warn *him*, while he was in use of the Forklift after the bankruptcy was filed, that the equipment was dangerous and he should take precautions in its operation. In this regard he clearly pleaded a post petition claim in which the Debtor's acts or omissions complained of were all post petition. There was no pre-petition omission to warn Ramirez, nor any impact on Ramirez of such omissions pre-petition, because he did not start use of the equipment until post petition. Debtor therefore is not alleged to have asserted any wrong against him under this theory except post petition. Under all the cited authority, Ramirez had no pre-petition right to payment and no conceivable claim pre-petition, contingent, unmatured or otherwise. Debtor's alleged post petition omission to warn about an allegedly dangerous condition would, if true, be an act of harmful negligence or omission committed during the pendency of a bankruptcy proceeding. Indeed, under the plain wording of 11 U.S.C. § 101(4) there was no pre-petition claim under this theory, and therefore the automatic stay under § 362(a) does not apply to the part of Ramirez' claim based thereon.

### B. Claims based on negligence and strict liability

Ramirez also asserts claims based on design and manufacture negligence and strict liability theories. This asserted pre-petition negligence did not impact on Ramirez in any way whatsoever until he used the Forklift after Pettibone had filed its petition in reorganization. Pettibone's actions with respect to the product under those theories were all clearly pre-petition, as Pettibone completed manufacture and delivered the Forklift to Ramirez's employer before filing the petition under Chapter 11. However, there was no pre-petition impact on Ramirez through privity of contract with him or his employer, not through any pre-petition contact with the Forklift, not through injury, and not otherwise. Ramirez had no pre-petition contact with the Forklift at all, as he was not hired until after Pettibone's petition was filed.

Ramirez therefore argues that his claim arose wholly post petition, as injury is an essential element of both the negligence and strict liability causes of action. Ramirez maintains that not all the operative facts giving rise to liability were or could be present until injury occurred post-petition. He argues that a claim, contingent or otherwise, does not exist unless all facts and relationships underlying the substantive cause of action are in place and harm or personal impact has occurred. Ramirez cites one products liability case involving a similar timing problem, *In re White Motor Corp.*, Civil Action No. C84–402 (N.D. Ohio 1984) [available on WESTLAW, 1984 WL 15645] (available on LEXIS), that found the claim was post-petition.

Pettibone contends that Ramirez mistakenly equates the existence of a claim with the accrual of the related cause of action under nonbankruptcy law. Pettibone would focus solely on the actions of the debtor in determining the time at which a claim in bankruptcy arises. In support of this proposition, Pettibone cites authority that held a claim to arise when all acts giving rise to liability are performed. Pettibone finds *Robins* especially analogous, relying on discussion in *Robins* regarding the need to determine the allowance of claims in bankruptcy under uniform federal standards. However, in *Robins,* the prod-

ucts injury (or at least impact giving rise to future injury) had occurred pre-bankruptcy, with manifestation the sole event occurring post-petition. The completed pre-petition conduct of debtor had impacted on the claimant pre-petition. However, those facts giving rise to unmatured claims there are not the facts here.

Both parties maintain that their position is correct under the often-cited principles of *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946):

> What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition in bankruptcy is filed, is a question which, in the absence of overruling federal law, is to be determined by reference to state law.

> In determining what claims are allowable and how a debtor's assets shall be distributed, a bankruptcy court does not apply the law of the state where it sits.

*Id.*, 329 U.S. at 161–62, 67 S.Ct. at 240. *Vanston* indicates that the existence or nonexistence of a claim should be determined under non-bankruptcy law. Once the existence of the claim is established, bankruptcy law determines whether the claim should be allowed in the case. *State of Ohio v. Collins (In re Madeline Nursing Homes)*, 694 F.2d 433, 438 (6th Cir. 1982).

Under substantive tort law, Ramirez's claim did not exist at the time Pettibone filed its petition for reorganization. Under nonbankruptcy law, the cause of action did not exist until injury occurred:

> To warrant the recovery of damages in any case, there must be a right of action for a wrong inflicted by a plaintiff therefrom. Wrong without damage, or damage without wrong does not constitute a cause of action. *Jensen v. Allen*, 63 N.M. 407, 320 P.2d 1016, 1017 (1958). The gist or essence of a right of action for injury caused by negligence is the injury or damage which has been wrongfully done to plaintiff. Hence, a cause of action for negligence exists or accrues only when injury or damage has been caused thereby to plaintiff ... 65A C.J.S.

*Negligence § 175b (1966)*. ... a manufacturer or seller is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being. 72 C.J.S. Supplement *Products Liability* § 8 (1975).

In New Mexico, to establish a claim for strict products liability Ramirez must show he was injured as a result of Debtor's design, manufacture, or sale of a defective product that was unreasonably dangerous. *Stang v. Hertz Corp.*, 83 N.M. 730, 497 P.2d 732 (1972); *Tenny v. Seven–Up Company*, 92 N.M. 158, 584 P.2d 205 (Ct.App. 1978), *cert. den.* 92 N.M. 180, 585 P.2d 324 (1978).

Thus, the law of New Mexico where Ramirez suffered his injury and filed his suit clearly requires an injury impacting on plaintiff to give rise to a cause of action, as does state law generally.

Normally, a bankruptcy claim comes into existence at the same time it accrues under state law. Therefore, state law is normally used in determining whether that claim arose post-petition. Cases discussed in this opinion recognized exceptions to the rule. Due to competing policy concerns, both indemnification cases and mass tort cases using a discovery or manifestation rule have often found the cause of action deferred until sometime after the actual wrongful conduct involved in product manufacture or delivery. This was done so as not to deprive claimants of their nonbankruptcy cause of action.

But in all of those cases, there was some pre-bankruptcy privity, contact, impact, or hidden harm to the ultimately injured plaintiff or indemnity claimant. All those cases are distinguished from the facts here where there was no such pre-bankruptcy privity, contact, impact, or hidden harm that affected Ramirez. Here, therefore, Ramirez had no contingent, unmatured, inchoate or hidden claims at the time Pettibone filed in bankruptcy.

The applicable principles of law are these:

■ If a tort claimant is exposed to a defective product and sustains a bodily injury (or impact that gives rises to future injury) prior to the commencement of the debtor's case, the claimant's bankruptcy claim arises pre-petition. This rule applies regardless of nonbankruptcy law providing that the cause of action on the claim does not arise until the claimant discovers his injury or the cause of the injury. Accordingly, in case of pre-petition exposure to harmful chemicals, drugs, materials or interuterine devices, the bankruptcy courts will presume that a bodily injury was sustained at the time of the exposure to the defective product. *In re Edge,* 60 B.R. 700–01. For bankruptcy purposes, the claim will be deemed to arise at that time, regardless of whether the injury remains latent and does not manifest itself until after a case is commenced. "[I]t is the injury and not its discovery that makes the manufacturer liable in the underlying tort suit ..." *Id.* (quoting *Insurance Co. of North America v. Forty–Eights Insulations, Inc.,* 633 F.2d 1212, 1220 (6th Cir. 1980) *cert. denied,* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981)). In such cases, the bankruptcy claim exists before a nonbankruptcy cause of action accrues.

■ Conversely, if a tort claimant whose employer had purchased a defective product pre-petition is exposed only post-petition to that product and sustains bodily injury only after filing of the manufacturer's bankruptcy, the claimant's bankruptcy claim arises post-petition. This is so even though the debtor wholly manufactured and sold the defective product before commencement of the bankruptcy. The mere manufacture and sale of a defective product to an unrelated third party does not give rise to liability to the person injured post-petition; standing alone, that act does not give rise to liability to that ultimately injured person. *In re UNR Industries, Inc.,* 29 B.R. at 745. There is no relationship at all between a tort claimant and a debtor until the claimant is at least exposed to the debtor's defective product. A post-petition tort claim cannot be presumed to relate to a pre-petition relationship that did not actually exist. *Id.* Consequently,

where the claimant is only exposed to and injured by the debtor's product post-petition he has no existing claim as of the petition date; in that case the claim can arise only post-petition. *In re White Motor Corporation,* No. 84–402 (N.D. Ohio Feb. 10, 1984) (Slip Opinion); *cf. Matter of U.S. Truck, Inc.,* 42 B.R. 790 (Bankr.E.D. Mich.1984) (workman's compensation claims arise for bankruptcy purposes as of the date of injury).

One question that need not be reached here is this: Whether a party endangered by defective product pre-petition through contract privity, use, or otherwise but not injured until post-petition has an unaccrued claim under 11 U.S.C. § 101(4). That question will be left for resolution in some future case that poses those facts. Under cited authority a pre-petition "claim" for bankruptcy purposes is certainly possible although not then existing under nonbankruptcy law. But judicial construction of the breadth of § 101(4) must be based on specific fact situations in cases presented.

It must be added that the bankruptcy policies of relief to debtors and encouragement of business reorganization are powerful social and economic objectives incorporated in the Bankruptcy Code and applicable authorities. But those policies and values cannot strain the broad words of § 101(4) into an unreal meaning. To say that Ramirez had an unmatured pre-bankruptcy claim under the facts admitted here would be to adopt the perspective of the character in Alice in Wonderland who opined that words meant what he intended them to mean.

The policy of relief to debtors and business reorganization cannot distort the broad but not unlimited Congressional definition of "claim." We cannot reason from the possibility of adverse results to debtors-in-possession and their reorganizations that they must have rights not provided in the law.

■ Accordingly, as of the date of filing of this case Ramirez had no claim against Debtor under either bankruptcy or nonbankruptcy law. Therefore, 11 U.S.C.

§ ·362(a) does not bar his civil action. Ramirez must prevail on Count I of the Amended Complaint and on his Counterclaim. His Civil Action may continue unless an injunction comes to be entered under Count III.[6]

## V. The Issues in Count III

In Count III, Plaintiff seeks declaration that Ramirez holds at best a mere pre-petition general unsecured claim. Ramirez contends that he has a post-petition administrative claim under 11 U.S.C. § 503.

■■■ While the foregoing discussion of Count I concluded that the claim is post-petition, that alone does not decide the issues under Count III. The fact that a claim arises post-petition does not necessarily entitle the claimant to an administrative priority under § 503. *Cramer v. Mammoth Mart, Inc. (In re. Mammoth Mart, Inc.)* 536 F.2d 950, 955 (1st Cir.1976). Administrative priority is only available when the debtor-in-possession's actions give rise to liability. *Id.* The Seventh Circuit has recognized a two-prong test for determining administrative priority. A claim will be afforded such priority if the debt both (1) arises from a transaction with the debtor-in-possession *and* (2) that transaction benefitted the debtor-in-possession in the operation of its post-petition businesses. *Matter of Jartran, Inc.*, 732 F.2d 584, 587 (7th Cir.1984).

Administrative expenses are incurred as part of the effort to maximize the value of the bankruptcy estate. *Matter of Chicago, Rock Island and Pac. R.R. Co.*, 756 F.2d 517, 519 (7th Cir.1985). Creditors are the intended beneficiaries of the continued operations of a reorganizing debtor. *Reading Co. v. Brown*, 391 U.S. 471, 478, 88 S.Ct. 1759, 1763, 20 L.Ed.2d 751 (1968). Tort claims are competitive with, rather than beneficial to other creditors' interests. *Chicago Rock Island*, 756 F.2d at 520.

■■■ Tort claims arising through accidents occurring during the administration of an estate, and arising out of a bankruptcy receiver's scope of authority with regard to the estate's ongoing business activities, give rise to administrative expenses. *Reading Company v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968). However, the literal holding in *Reading* was that damages resulting from negligence of a bankruptcy receiver acting within the scope of his authority as receiver gave rise to "actual and necessary" costs of a Chapter XI arrangement under the Bankruptcy Act. *Id.* at 485, 88 S.Ct. at 1767. While our Seventh Circuit mentioned *Reading* in *J. Catton Farms v. First Nat. Bank of Chgo.*, 779 F.2d 1242, 1249 (7th Cir.1985) with a *dicta* observation about tort claims, *Catton Farms* involved no tort claims and the opinion expressly stated that it was not deciding questions of priority. *Id.* at 1249. While it can be argued as Ramirez does that adoption of the Code carried with it the "gloss" of prior decisions under the Act including *Reading*, this Court is bound by the Seventh Circuit definition in *Jartran* of requirements for establishing administrative priority under the Code. Moreover, the two tests of *Jartran* would have been met under the facts in *Reading*, and *Jartran* is not inconsistent with *Reading*.

■■■ It appears that Ramirez can meet the two *Jartran* requirements for administrative claim should he prevail under his theory of post-petition failure to warn. If debtor-in-possession owed but failed to give warnings to users of its products post-petition, the resulting claim would have an administrative priority. A manufacturing debtor-in-possession which, like Pettibone, continues in Chapter 11 to produce and sell goods and equipment may well under state tort law owe a duty to warn users of products about pre-petition design defects and dangers of its products purchased pre-petition. (Authority does suggest that the debtor-in-possession is for at least some purposes the same entity as the pre-petition debtor, e.g. *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 528, 104 S.Ct. 1188, 1197, 79 L.Ed.2d 482 (1983) though that issue is

---

**6.** Nothing in this opinion is intended to pass upon the question whether Ramirez has any action or claim at all against Debtor in the light of *Estate of Boyle v. United Technologies*, —— U.S. ——, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988) and not briefed by the parties).

not before this Court.) If so, failure to fulfill that duty would be sufficient "transaction" with Ramirez under the *Jartran* test because its duty and omission impacted on him during the bankruptcy reorganization.

The debtor-in-possession benefitted by the continued confidence in its products by purchasers of its post-petition products. That confidence carries with it a business expectation that the products are reasonably safe and that known dangers will be disclosed. So long as debtor-in-possession continues in operation and sales, it benefits from such business confidence and the resulting goodwill of its customers. If there was a duty to warn Ramirez, the omission to do so was also a breach of that confidence of current customers and product users which has kept the Debtor alive and growing in Chapter 11.

It must be concluded that a manufacturing debtor who is found liable under state tort law for omitting a post-petition duty to warn about a product dangerously designed and manufactured pre-petition would be liable under a cognizable "transaction" with debtor-in-possession so closely related to and supportive of the operation of the post-petition business as to meet the *Jartran* tests.

However, should Ramirez not prevail on the theory of post-petition duty to warn, he may still prevail under the theories of pre-petition strict liability, or design and manufacture negligence. If so, the acts of strict liability and negligence were by the pre-petition Debtor and benefitted it, and were not shown to have been for the benefit of the debtor-in-possession during bankruptcy. Certainly they were not part of any "transaction" with Ramirez. If Ramirez prevails on that theory, his claim will not have administrative priority under *Jartran.*

Thus, no present determination can be made on Plaintiff's contention in Count III that Ramirez has merely a general unsecured claim without administrative priority. That Count must be held in abeyance until the State Court Civil Action is decided. Summary judgment on the cross motions relating to that Count must be denied.

It must also be observed that Ramirez's claim has arisen during the post-petition period preceding confirmation of Pettibone's plan. Tort or other claims arising prior to plan confirmation are within the scope of the discharge under § 1141(d)(1)(A) unless otherwise provided for in the Plan or confirmation order. *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Corp.),* 75 B.R. 944, 949 (Bankr.N.D.Ohio 1987). Pettibone may be able to make provision for Ramirez's claim in its plan.

Given the instant ruling, provision will likely be made in the Pettibone Plan of Arrangement to treat Ramirez as an administrative claimant if he prevails on the theory of omitted duty to warn.

However, provision may also be made under § 1141(d)(1)(A) to deal with the Ramirez claim in some way if he prevails on the pre-petition negligence theory. If no such provision is made in the Plan or confirmation order, it appears that the Ramirez claim for pre-petition negligence and strict liability would be discharged upon confirmation without any treatment or payment. As to whether such should be permitted if objected to, this Court may have to determine that issue if presented as part of the confirmation process. With the benefit of this ruling the parties may negotiate a solution acceptable to both sides before then, or we may meet this issue at the confirmation hearing.

VI. *Count II to be Set for Trial*

As a post-petition claim, Ramirez's claim is not subject to the automatic stay under § 362(a)(1). This Court may, however, enjoin the Civil Action through new injunction if the usual injunctive standards are met:

The statutory power of the bankruptcy court to stay actions is not, however, limited to section 362(a)(1) and (a)(3). It has been repeatedly held that 11 U.S.C. § 105 which provides that the bankruptcy court 'may issue any order, process, or judgment that is appropriate to carry out the provisions of this title', 'empowers the bankruptcy court to enjoin par-

·ties other than the bankrupt' from commencing or continuing litigation.

*A.H. Robins Co., Inc. v. Piccinin (In re A.H. Robins Co., Inc.),* 788 F.2d 994, 1002 (4th Cir.), *cert. denied,* 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986). The Bankruptcy Court may use this equitable power under § 105 to assure the orderly conduct of the reorganization proceedings. *Erti v. Paine Webber Jackson & Curtis, Inc. (In re Baldwin–United Corp. Litig.),* 765 F.2d 343, 348 (2d Cir.1985).

In considering whether to allow Ramirez's case to proceed, the Court may consider the cumulative effect it would have on the reorganization if similarly situated parties were also allowed to proceed. *See Johns–Manville Corp. v. Asbestos Litig. Group (In re Johns–Manville Corp.),* 40 B.R. 219, 224 (S.D.N.Y.1984). Given the realities of modern litigation, multiple lawsuits may seriously interfere with ongoing Chapter 11 proceedings. *Id.* Pettibone has presented the uncontroverted affidavit of its vice president and general counsel to the effect that 10 actions involving "postpetition" accidents are pending against the company, and that the company lacks funds to defend these suits.

Debtor cannot use the cash collateral of its secured creditors without their consent because it has not been able to show adequate protection for such use. There has been consent for use of the cash collateral to operate the business, but not to defend any of the many injury claims. Were the stay to be modified, Debtor may be able to show irreparable harm in being required to defend this and other cases without resources. The Court may consider entry of an injunction to prevent such harm.

Such new injunction is sought under Count II of the Amended Complaint. However, neither party has sought summary judgment on that Count, nor briefed it. There is no way from the present record that this Court could decide the injunction issues. Indeed, given the fact specific basis for ruling as to Ramirez, it is entirely possible that some or all of the other cases apprehended by Debtor may be stayed under 11 U.S.C. § 362(a), depending on the

facts in those cases. Also, because Count III must await decision in the State Court action it may be that the result of the requested injunction would be to block any resolution of the Ramirez administrative claim. At any event, we cannot reach these questions now and Count III must be set for trial on the usual standards applicable in injunction cases.

### CONCLUSION

Accordingly, by separate order, the Plaintiff's motion for Summary Judgment on Counts I and III will be denied, Defendant's motion for Judgment on Count III will be denied, and Defendant's motion for Summary Judgment on Count I and on his Counterclaim will be allowed and judgment entered thereon. Counts II and III will be set for status call at which time this Court will fix a date for closing of discovery in Count II and set that Count on a track toward trial preceded by pretrial conference.