**BIG YANK CORPORATION,**
Plaintiff–Appellee,

v.

**LIBERTY MUTUAL FIRE INSURANCE COMPANY, Defendant–Appellant.**

In re **WATER VALLEY FINISHING, INC., et al., Debtors.**

No. 96 Civ. 3849 (PKL).

United States District Court,
S.D. New York.

Dec. 19, 1996.

Brown, Todd & Heyburn P.L.L.C., Louisville, KY (Charles S. Cassis, Donald L. Miller II, Maureen P. Taylor, of counsel), Aron, Twomey, Hoppe & Gallanty, New York City (Michael E. Twomey, Gary Hoppe, Anthony Del Vecchio, of counsel), for Appellant–Defendant.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City (Robert S. Smith, of counsel), for Plaintiff–Appellee.

## OPINION & ORDER

LEISURE, District Judge:

This appeal arises from an adversary proceeding in the United States Bankruptcy Court for the Southern District of New York. That court ruled that a Kentucky district court's award of sanctions in the form of attorney's fees imposed against plaintiff-appellee Big Yank Corporation ("Big Yank") was discharged in bankruptcy under 11 U.S.C. § 1141(d)(1) and under the terms of the order of confirmation of a plan of reorganization. Defendant-appellant Liberty Mutual Fire Insurance Company ("Liberty Mutual") brings this appeal. Appellate jurisdiction in this Court is based on 28 U.S.C. § 158 and Rule 8001(a) of the Federal Rules of Bankruptcy Procedure. For the reasons stated below, the holding below is affirmed.

## BACKGROUND

Big Yank, before its Chapter 11 reorganization under the designation New Circle/Flag Wharf/Merrill Lynch, manufactured blue jeans. Liberty Mutual was Big Yank's workers' compensation carrier, and handled a number of workers' compensation claims in connection with Big Yank's closing of one of its plants. In 1992, Big Yank filed suit against Liberty Mutual in the United States District Court for the Eastern District of Kentucky, charging breach of contract, negligence, and bad faith insurance practice in the handling of the claims. In the course of this litigation, court-ordered Offers of Judgment were exchanged pursuant to Rule 68 of the Federal Rules of Civil Procedure.[1] Big Yank's demand was $6,000,000 and Liberty

Mutual's offer was $200,000. The parties were unable to settle the action.

According to the terms of the Offers of Judgment, which were set at the district court's express direction, both sides' offers included demands for attorneys' fees incurred after the rejection or expiration of the offers, and the attorneys' fees were to be awarded in the event that a party obtained a judgment more favorable than its rejected offer. Thus, if Big Yank's rejected demand of $6 million was exceeded by the actual judgment awarded, Big Yank would have recovered its attorneys' fees incurred after the settlement was rejected; similarly, if the final judgment was less than Liberty Mutual's offer of $200,000, Liberty Mutual would have recovered its fees. The Offers of Judgment were set to expire if not accepted by September 25, 1993. Both offers of judgment were rejected as of that date, and the case went forward. Liberty Mutual moved for summary judgment, and on March 28, 1995, the district court entered an order granting summary judgment. On July 13, 1995, the court entered a further order awarding attorneys' fees as sanctions, in the amount of $435,640.57.

The court specifically stated that it did not award the fees pursuant to the Offers of Judgment, because the court found that no contract had been entered;[2] rather, the court stated, the sanctions were imposed pursuant to the common law principle that, in extraordinary cases where litigation is found to be completely frivolous and without merit, the court may in its discretion exercise its inherent powers to impose the costs of defense upon the frivolous litigant. The court

1. The Offers of Judgment differed in some respects from the typical Rule 68 offers. Whereas Rule 68 only contemplates offers by a "party defending against a claim" and payment of attorneys' fees by such a party, the Offers of Judgment in this case were from both sides and contemplated fee-shifting by either side.

2. The basis on which the district court appears to have ruled, that the parties did not accept the offers *of judgment*, leads to a strange result. *See* Order at 3–4, *Big Yank Corp. v. Liberty Mut. Fire Ins. Co.*, (E.D.Ky. July 13, 1995) (attached as Oberlander Aff.Ex. H) (citing *Goodheart Clothing Co. v. Laura Goodman Enters.*, 962 F.2d 268, 272 (2d Cir.1992)). If the fee-shifting agreement

could only be deemed to be binding if one of the offers of judgment had been accepted, then any such agreement would have been meaningless, since once an offer of judgment was accepted, no fee-shifting would occur. Thus, the basis of the Kentucky court's holding that there was no contract for fee-shifting is unclear; there is no further evidence in the record on this appeal indicating whether or not the offer of an agreement *to shift fees* was accepted or not. But this Court need not determine that question, because, under the doctrine of the law of the case, this Court must accept at face value the holding that there was no valid contract for the shifting of attorneys' fees.

stated that Big Yank "had churned a worthless claim" and "had asserted a truly desperate claim, completely meritless." Order at 5–6, *Big Yank Corp. v. Liberty Mut. Fire Ins. Co.*, (E.D.Ky. July 13, 1995) (attached as Oberlander Aff.Ex. H). The court thus concluded that the suit was brought in bad faith, and awarded fees to Liberty Mutual.[3]

In the meantime, on September 24, 1993— coincidentally, the day before the offers were to expire—Big Yank filed a Chapter 11 petition in the United States Bankruptcy Court for the Southern District of New York. Liberty Mutual received notice of the petition and the bar date of December 1, 1993. This notice was issued only because Liberty Mutual was listed as a creditor holding an undisputed claim for unpaid premiums, and no notice was given on the basis of a potential recovery of attorneys' fees. A Second Amended Plan of Reorganization (the "Plan") was confirmed in the Bankruptcy Court on August 8, 1994. On April 27, 1995, Liberty Mutual tendered its Proof of Claim for attorneys' fees in Bankruptcy Court, on the basis that it could recover the fees based on the fee-shifting terms of the Offers of Judgment. Although the claim was filed after the confirmation of the Plan, it was tendered within 30 days of the granting of summary judgment in the district court.[4] The Bankruptcy Court rejected the Proof of Claim.

Big Yank brought this adversary proceeding in the Bankruptcy Court seeking a declaratory judgment that Liberty Mutual's claims for attorneys' fees arose preconfirmation and therefore were discharged under 11 U.S.C. § 1141(d)(1). At a hearing on April 9, 1996, the Bankruptcy Court found that the award of attorneys' fees was "within the fair contemplation of the parties" as of August 18, 1993, the date when the Kentucky district court directed the parties to make the Offers of Judgment and warned them that the successful party would be awarded attorneys' fees.[5] Tr. at 12, *In re Water Valley Finishing, Inc.* (No. B 44780, Adversary Proceeding No. 96/8024A) (U.S.Bankr.S.D.N.Y. Apr. 9, 1996) (attached as Oberlander Aff.Ex. A). The court therefore concluded that the sanctions represented a contingent or unmatured claim that arose before the filing of the bankruptcy petition, the bar date, and the confirmation of the reorganization plan. As a claim that arose preconfirmation, the court held, the sanctions award was discharged in bankruptcy. Liberty Mutual appeals this ruling.

## DISCUSSION

The Court must accept as true the findings of fact of the Bankruptcy Court, unless such findings are clearly erroneous, and the Court reviews conclusions of law *de novo*. *See* Fed.R.Bankr.Proc. 8013; *Brunner v. New York State Higher Educ. Servs.*, 831 F.2d 395, 396 (2d Cir.1987) (per curiam). The factual findings are not in dispute, but the central legal conclusion in dispute is the timing of the accrual of Liberty Mutual's claim for the sanctions award. Liberty Mutual insists that such a claim did not arise until the district court announced its decision granting summary judgment and making its findings of bad faith on Big Yank's part. That decision was issued nearly eight months after the confirmation of the Plan. If indeed the claim arose no earlier than that date, then clearly Liberty Mutual cannot be expected to have tendered its Proof of Claim before the confirmation. However, if the claim arose prior to the date of the confirmation, then Liberty Mutual, by failing to make a claim, essentially waived its rights and the debt was discharged by confirmation of the plan.

### I. *Accrual of a "Claim"*

In bankruptcy law, a "claim" is defined as a "right to payment, whether or not such right is reduced to judgment," and including a contingent or unmatured right to payment. *See* 11 U.S.C. § 101(5)(A) (1994).

---

**3.** Both the summary judgment and the award of attorneys' fees have been appealed, briefed, and argued to the Sixth Circuit.

**4.** Appellant argues that, because it tendered its claim within 30 days of the date of judgment as provided by Rule 3002(c)(3) of the Federal Rules

of Bankruptcy Procedure, the Proof of Claim was timely.

**5.** The decision was confirmed in an Order and Judgment entered on April 18, 1996.

Many of the cases discussing the accrual of unmatured or contingent claims may be generally categorized as tort cases and contract cases.[6] Usually, under contract theory, any right to payment that is grounded in a contract executed before the date of the petition is considered a claim that arose prepetition, even if such a contract claim was not ripe for suit at the time of the petition. Contractual rights to indemnification or contribution present a paradigmatic case. Suppose that creditor $C$ contracts with debtor $D$ that $D$ will indemnify $C$ as to certain types of legal claims if any claimant wins such a suit against $C$. $D$ then goes into bankruptcy. $C$ is subsequently sued, successfully, by plaintiff $P$ on a cause of action covered by the contract, based upon prepetition conduct. Even though $P$'s suit was commenced after the petition, the claim for indemnification is found to arise prepetition because both the underlying conduct and the contract were prepetition. The right to payment, in such a case the right to indemnification is not a *fait accompli* until $P$ brings and wins suit, and so $D$ might argue that there was no "claim" under bankruptcy law until after the petition. However, such an interpretation ignores the words "unmatured" and "contingent" in the statute. Such a contractual relationship presents "the classic case of a contingent right to payment under the [Bankruptcy] Code." *In re M. Frenville Co.*, 744 F.2d 332, 336 (3d Cir.1984) (holding that a "claim" arose postpetition when all the elements of the state cause of action based on prepetition acts did not arise until postpetition, but distinguishing the result from situations involving indemnity or security contracts); *see In re All Media Properties, Inc.*, 5 B.R. 126, 133 (Bankr.S.D.Tex.1980), *aff'd mem.*, 646 F.2d 193 (5th Cir. Unit A May 1981).

In cases involving a postpetition tort claim, the question of when the claim arose often revolves around the same type of situation: one or more of the legal elements of the cause of action arise after the petition, but some component of the underlying injury occurred before the petition. *See, e.g., Epstein v. Official Comm. of Unsecured Creditors, of the Estate of Piper Aircraft*, 58 F.3d 1573, 1577 (11th Cir.1995) (adopting a modified "prepetition relationship test" which the court dubbed the "Piper test," and holding that a claim exists preconfirmation if "events occurring before confirmation create a relationship, such as contact, exposure, impact, or privity, between the claimant and the debtor's product"). Different approaches have been applied in different situations among the circuits, and the three major approaches have been labeled "the accrued state law claim test, the conduct test, and the prepetition relationship test." *Id.* at 1576.

The Court of Appeals for the Second Circuit in *In re Chateaugay Corp.* posited a hypothetical case to illustrate why the so-called prepetition relationship test is appropriate:

> Consider, for example, a company that builds bridges around the world. It can estimate that of 10,000 bridges it builds, one will fail, causing 10 deaths. Having built 10,000 bridges, it becomes insolvent and files a petition in bankruptcy. Is there a "claim" on behalf of the 10 people who will be killed when they drive across the one bridge that will fail someday in the future? If the only test is whether the ultimate right to payment will arise out of the debtor's prepetition conduct, the future victims have a claim. Yet it must be obvious that enormous practical and perhaps constitutional problems would arise from recognition of such a claim.

*In re Chateaugay Corp.*, 944 F.2d 997, 1003 (2d Cir.1991). In such a case, the "claims" are arguably simply unmatured and contingent rights to payment, like contractual claims for indemnity. The actual legal right to be paid is one that will mature when an injury occurs and a judgment is entered for

---

6. Many of the cases discussed below address the issue of whether a claim existed prepetition for the purposes of determining whether an automatic stay should issue, whether a Chapter 7 discharge of prepetition claims applies, or other such questions. In this case, the milestone against which Liberty Mutual's claim is compared is the confirmation date rather than the petition date. The difference is not significant however, because key question in all of the cases and in this appeal is when a "claim" accrued, regardless of what milestone is used as a comparison.

the injured party. However, "[t]he concepts of 'maturity' and 'contingency' are not readily transferable from the context of contracts to that of tort and statutory claims." *Id.* at 1005. Unlike the case where a contract preexisted the petition, in this hypothetical tort case, the claimant has absolutely no pre-petition relationship or contact with the debtor, and thus to expect such a claimant to be able to file a proof of claim would be "absurd." *Id.* at 1003 (quoting *Schweitzer v. Consolidated Rail Corp.,* 758 F.2d 936, 943 (3d Cir.) (quoting *Gladding Corp. v. Forrer,* 20 B.R. 566, 568 (Bankr.D.Mass.1982)), *cert. denied,* 474 U.S. 864, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985)) (internal quotation marks omitted).

Accordingly, the *Chateaugay* Court noted, courts have required that some "pre-petition contact with the tort-feasor, such as purchasing a product or working in proximity to hazardous materials" must exist in order to find that a prepetition "claim" existed. *Id.* at 1004. The *Chateaugay* case involved claims to recover response costs incurred postpetition by the Environmental Protection Agency ("EPA") under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") in cleaning up sites where releases or threatened releases of hazardous materials had occurred prepetition. The Court addressed the question whether such claims, based on prepetition contamination but for recovery of postpetition response cost expenditures, constituted a prepetition claim in bankruptcy. The Court found that the prepetition relationship between the EPA and its regulated entities was sufficient to constitute the requisite level of "pre-petition contact" to make the CERCLA costs prepetition claims, because the parties were "acutely aware" of each other before the bankruptcy petition was filed. *Id.* at 1005.

II. *Application of These Concepts to the Instant Case*

■ The case at bar does not, according to the Kentucky district court, involve a contract claim; nor does it clearly involve a tort claim. Furthermore, appellant correctly argues that this case is not completely analogous to *Chateaugay* inasmuch as the holding in that case was directed at the regulatory relationship in the context of "the intersection of bankruptcy law and environmental law." *Chateaugay,* 944 F.2d at 999. Thus, *Chateaugay* 's statement that the fact that the parties were "acutely aware" of one another is not precisely applicable to the instant case. Nevertheless, as the contract and tort theory cases demonstrate, the principles underlying *Chateaugay* 's holding are not unique to the area of environmental law. The general principle is that a claim in the form of an unmatured or contingent right to payment can fairly be deemed to arise prepetition if, prior to the bankruptcy filing, the possibility of the claim was in the contemplation of the parties. The concept is the same, regardless of whether the claim was in the contemplation of the parties because they were "acutely aware" of one another, because a legal relationship such as a contract covering the potential claim existed between the parties, or because there was some "contact, exposure, impact, or privity" between the parties involved in a tort.

■ It is fair to say that in this case, the claim was within the contemplation of the parties prepetition and preconfirmation. Although the actual award of sanctions was rooted in the inherent powers of the court to sanction frivolous litigation rather than on the abortive Offers of Judgment contract, the possibility of an award of attorneys' fees was clearly in the contemplation of the parties before both the petition and the confirmation. First, the district court itself, in ruling on the award of sanctions, cited its own comments of August 18, 1993, regarding fee-shifting under the proposed Offers of Judgment contract, to support its holding that the parties had notice of the possibility of such sanctions. Second, appellant itself applied for an award of attorneys' fees on the basis of the Offers of Judgment. In sum, even though the district court eventually attached a different label to the award of fees, the claim was clearly understood by both the district court and the parties as being at least related to prepetition conduct with respect to the Offers of Judgment.

■ Liberty Mutual also argues that the claim for the sanctions award is analogous to

a claim for damages in an action for malicious prosecution, in that some of the elements of such a tortious claim overlap with the considerations that led the Kentucky district court to award attorneys' fees. Appellant points out that, in bankruptcy, such a tort claim would be deemed to arise at the point when, under non-bankruptcy law, all of the elements of the claim were fulfilled. Under the common law of Kentucky, in order to state a valid claim of malicious prosecution, a plaintiff must establish that the allegedly malicious lawsuit was determined in his or her favor. *See, e.g., Raine v. Drasin,* 621 S.W.2d 895, 899 (Ky.1981). Accordingly, appellant urges that this last element of such a claim was not satisfied until the district court decided the summary judgment motion in its favor. Since a malicious prosecution claim is in many respects comparable to a claim for sanctions under the court's inherent powers, appellant argues, the claim for attorneys' fees did not arise until the district court decided the summary judgment motion. Appellant's conclusion is unpersuasive for two related reasons.

First, the award of attorneys' fees was not based on a tort claim. The district court explicitly based the award on its inherent powers, and the Supreme Court has stated that a district court can exercise such powers to award sanctions to either party, winner or loser. *See Chambers v. NASCO, Inc.,* 501 U.S. 32, 53, 111 S.Ct. 2123, 2137, 115 L.Ed.2d 27 (1991) ("[T]he imposition of sanctions under the bad-faith exception depends not on which party wins the lawsuit, but on how the parties conduct themselves during the litigation."). Thus, the analogy to the malicious prosecution cause of action—and the argument that therefore such sanctions did not exist conceptually until Liberty Mutual won summary judgment—is not altogether apt.

Second, even in the context of tort claims, courts have noted the distinction between the accrual of a claim in bankruptcy and the accrual of a present right of access to the court. *See, e.g., In re Edge,* 60 B.R. 690, 704 (Bankr.M.D.Tenn.1986) (criticizing *M. Frenville Corp.*'s accrued state law claim test for "failing to differentiate access to the courts and 'claim' in bankruptcy"); *In re Johns-*

*Manville Corp.,* 57 B.R. 680, 690 (Bankr. S.D.N.Y.1986) (criticizing the *M. Frenville Corp.* rule). The tort requirement that a litigant must have won a favorable disposition in the underlying, allegedly malicious litigation functions essentially as a rule of access to the courts. It operates to prevent a party from commencing a suit before the result of the underlying dispute is determined, and helps to avoid inconsistent results. *See Raine,* 621 S.W.2d at 900 ("The basis of the requirement is that courts will not tolerate inconsistent judgments on the same action between the same parties."). In bankruptcy, recognition of a claim does not present the risk of an inconsistent judgment, because recognizing an unmatured or contingent claim does not determine the merits of the claim. Therefore, the tort requirement that a claimant prevail in the underlying suit is particularly inapt to the "claim" analysis under bankruptcy law.

### III. *Bankruptcy Policy*

■ Finally, Liberty Mutual argues that affirmance of the discharge would in effect allow a party to litigate in bad faith without fear of sanctions, in the knowledge that by filing for bankruptcy it could obtain a discharge of any sanction. The argument is unconvincing. First, not every bad faith litigant could have sanctions discharged: only those who could show that the parties had within their contemplation the possibility of sanctions before the petition or confirmation date in bankruptcy. More importantly, this rule fulfills one of the primary purposes of bankruptcy law: to give all creditors an equal footing in making their claims on an entity running out of funds. This purpose would be defeated if a creditor were allowed to sit on its unmatured or contingent claim, biding its time until it could collect in full from the reorganized entity. In this case, Liberty Mutual had a fair chance to tender its preexisting claim for a potential award of sanctions, and should have tendered its contingent, unmatured claim—the potential for which was within Liberty Mutual's contemplation before confirmation of the plan—at the appropriate time: before confirmation of the Plan.

## CONCLUSION

For the reasons stated above, the holding of the Bankruptcy Court is HEREBY AFFIRMED.

**SO ORDERED.**